James Jay Tutchton (CA State Bar # 150908)
Tutchton Law Office
6439 E. Maplewood Ave.
Centennial, CO 80111
(720) 301-3843
E-mail: jtutchton@wildearthguardians.org

Marianne Dugan, *pro hac vice* (Oregon State Bar # 932563)
E-mail address mdugan@mdugan.com
259 E. 5th Ave., Ste 200-D
Eugene, OR 97401
(541) 338-7072
Fax no. 866-650-5213

        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

CONSERVATION CONGRESS

        Plaintiff,

        v.

UNITED STATES FOREST SERVICE and
UNITED STATES FISH AND WILDLIFE
SERVICE,

        Defendants.
_____

No. 2:12-cv-02416-WBS-KJN

PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY
JUDGMENT (NEPA CLAIMS)

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

I.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

       A.     Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

              1.     Tatham Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

              2.     M9 Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

              3.     Log Springs Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

       B.     The Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

              1.     Tatham Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

              2.     The M9 and Log Springs Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

       C.     The Northwest Forest Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

       D.     Late-Successional Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

       E.     Northern Spotted Owl (NSO) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

              1.     NSO within the Tatham project area . . . . . . . . . . . . . . . . . . . . . . . . . . .9

              2.     Listing of NSO under the Endangered Species Act . . . . . . . . . . . . . . . .9

              3.     NSO "critical habitat units" (CHU) . . . . . . . . . . . . . . . . . . . . . . . . . . .9

              4.     NSO habitat within the Tatham project area . . . . . . . . . . . . . . . . . . . .11

              5.     Amount of NSO habitat that will be affected by the Tatham project . . .11

              6.     Impact of fuelbreaks on NSO habitat in the Tatham project area . . . . . .12

              7.     Recovery planning for the Northern Spotted Owl . . . . . . . . . . . . . . . . .12

       F.     USFS Rationale for the Tatham Project . . . . . . . . . . . . . . . . . . . . . . . . . . .14

       G.     Mendocino Forest Plan Inventory and Monitoring Requirements . . . . . . . . . .14

       H.     Cumulative Impacts to NSO and Baseline . . . . . . . . . . . . . . . . . . . . . . . . . .15

II.    STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.      PLAINTIFFS HAVE STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.     DEFENDANT IMPROPERLY USED A "CATEGORICAL EXCLUSION" FROM
        NEPA AND FAILED TO DISCLOSE AND ANALYZE IMPACTS AS REQUIRED BY
        NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.      The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        B.      Categorical Exclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.      Defendant's Use of a CE for the Tatham Project is Inappropriate and Violates NEPA
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        D.      Defendant's Use of a CE for the M9 and Log Springs Projects is Inappropriate and
                Violates NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        E.      The Decision Memos Are Not a Substitute for a NEPA Analysis Document
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.    DEFENDANT FAILED TO DISCLOSE AND ANALYZE CUMULATIVE IMPACTS
        AS REQUIRED BY NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.      Tatham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        B.      M9 and Log Springs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.     DEFENDANT'S FAILURE TO PREPARE A FULL ENVIRONMENTAL IMPACT
        STATEMENT VIOLATES NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# TABLE OF AUTHORITIES

**CASES**

Alaska State Snowmobile Ass'n, Inc. v. Babbitt, 79 F. Supp. 2d 1116 (D. Alaska 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 26

Anderson v. Evans, 314 F.3d 1006 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Bennett v. Spear, 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208 (9th Cir. 1998) . . . . . . . . . 16

Bowen v. American Hosp. Ass'n, 476 U.S. 610, 106 S. Ct. 2101 (1986) . . . . . . . . . . . . . . . . . 16

Cal. ex reI. Lockyer v. USDA, 575 F. 3d 999 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Carpenters' Industrial Council v. Salazar, 734 F. Supp. 2d 126 (D.D.C. 2010) . . . . . . . . . . . . 10

Circuit City Stores, Inc. v. Adams, 532 U.S. 105 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ecology Center v. Austin, 430 F.3d 1057 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Friends of the Clearwater v. Dombeck, 222 F.3d 552 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 5

Heartwood, Inc. v. United States Forest Serv., 230 F.3d 947 (7th Cir. 2000) . . . . . . . . . . . . . . 20

Heartwood, Inc. v. United States Forest Serv., 73 F. Supp. 2d 962 (D. Ill., 1999) . . . . . . . . 24-25

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 335 (1977) . . . . . . . . . . . . . . 17

Idaho Sporting Congress v. Thomas, 137 F.3d 1146 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 17

Kern v. BLM, 284 F.3d 1062 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto., 463 U.S. 29 (1983) . . . . . . . . . . . . . . 16

National Wildlife Fed. v. National Marine Fisheries Service, 524 F.3d 917 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

Northern Spotted Owl v. Lujan, 758 F. Supp. 621 (W.D. Wash. 1991) . . . . . . . . . . . . . . . . . . 10

NRDC v. Dept. of the Interior, 113 F.3d 1121 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 16

Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108 (9th Cir. 2004) . . . . . . . . . 16

Oliver v. Keller, 289 F.3d 623 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120 (9th Cir. 2007) . . . . . . . . 6-7

Pacific Coast Federation of Fishermen's Associations v. Nat'l Marine Fisheries Serv., 265 F.3d 1028 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pit River Tribe v. U.S. Forest Service, 469 F.3d 768 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 17

Public Citizen v. Dep't of Transportation, 316 F.3d 1002 (9th Cir. 2003) . . . . . . . . . . . . . 34, 36

Rhodes v. Johnson, 153 F.3d 785 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 26

Riverhawks v. Zepeda, 228 F. Supp. 2d 1173 (D. Or. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

State of California v. Norton, 2002 WL 31681515 (9th Cir. 2002) . . . . . . . . . . . . . . . 20, 21, 26

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626 (9th Cir. 1987) . . . . . . 15

West v. Secretary of DOT, 206 F.3d 920 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**STATUTES**

5 U.S.C. 551-706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

5 U.S.C. 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

16 U.S.C. 1531 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16 U.S.C. 1532(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16 U.S.C. 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

16 U.S.C. 1604(g)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. 4321-4370(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 27

**RULES AND REGULATIONS**

36 C.F.R. 220.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21, 26, 27, 29

40 C.F.R. 1500-1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

40 C.F.R. 1500.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

40 C.F.R. 1502.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1502.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1502.14(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

40 C.F.R. 1507.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

40 C.F.R. 1508.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

40 C.F.R. 1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18, 25, 27

40 C.F.R. 1508.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1508.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40 C.F.R. 1508.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. 1508.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 28

50 C.F.R. 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**OTHER AUTHORITIES**

48 Fed. Reg. 34263 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

49 Fed. Reg. 21439 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

50 Fed. Reg. 26078 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

55 Fed. Reg. 26114 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

56 Fed. Reg. 19718 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

57 Fed. Reg. 1796 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

57 Fed. Reg. 43180 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24-25

73 Fed. Reg. 29471 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

73 Fed. Reg. 43084 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

73 Fed. Reg. 47326 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

75 Fed. Reg. 56131 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

76 Fed. Reg. 38575 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

77 Fed. Reg. 71876 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Forest Service Handbook (FSH) Section 1909.15 . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21, 25

FSH 1952.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 260, plaintiff, by and through its undersigned attorney, hereby moves the Court for summary judgment and the following relief.[1]

## INTRODUCTION

This lawsuit challenges three logging projects proposed to take place on the Grindstone Ranger District ("the District") on the Mendocino National Forest, a unit of National Forest managed by the U.S. Forest Service (USFS). The three projects are Tatham Ridge Fuels Project ("Tatham Project"); M9 Sanitation and Salvage Project ("M9"); and Log Springs Commercial Thinning Project ("Log Springs").

Relevant to the current motion for partial summary judgment, plaintiff's suit challenges the decision of the USFS to "categorically exclude" these projects from environmental analysis under the National Environmental Policy Act (NEPA) and the USFS's failure to consider the cumulative impacts of these projects under NEPA. 42 U.S.C. 4321-4370(d); 40 C.F.R. 1500-1508.

Plaintiff also challenges the actions of both the USFS and Fish and Wildlife Service (FWS) under the Endangered Species Act (ESA) (16 U.S.C. 1531 et seq.) regarding the Tatham Project. Pursuant to the Court's order allowing bifurcation of summary judgment briefing, this brief addresses only the NEPA claims, with the ESA claims to be briefed later.[2]

The court's review of plaintiff's NEPA claims is governed by the Administrative Procedures Act (APA), 5 U.S.C. 551-706. Plaintiff's NEPA claims are brought pursuant to the

---

[1] Pursuant to the Court's January 3, 2013, order, Dkt 19 at 4, the requirement of filing a Statement of Undisputed Facts is waived.

[2] Pursuant to the Court's February 26, 2013, Order, Dkt. 29 at 2, "Plaintiff may pursue discovery regarding its ESA claims against USFS while plaintiff litigates its summary judgment motion on its claims under the National Environmental Policy Act ('NEPA')."

PAGE 1 - PLF'S BR. IN SUPP. OF MO. FOR PARTIAL SUMMARY JUDGMENT (NEPA)

right of review provision of the APA, 5 U.S.C. 702).

Plaintiff challenges defendant USFS's failure to meet its procedural and substantive duties required by NEPA by failing to adequately perform environmental review for the three projects, and USFS's decision to invoke a "categorical exclusion" to NEPA for these projects.

Plaintiff seeks:

An order declaring that defendant USFS failed to comply with NEPA;

An order enjoining defendant USFS from undertaking activities on the three projects unless and until defendant USFS complies with the NEPA and the APA;

An award of Plaintiff's reasonable attorneys' fees and costs associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412;

Such additional and further relief as the Court deems just and equitable.

The requested relief is necessary to preserve the *status quo*, to prevent illegal agency action, and to forestall irreparable injury to the environment.

I.       **FACTUAL BACKGROUND**

        **A.       Procedural History**

                **1.       Tatham Project**

In late May 2012, Acting District Ranger Victoria Stoll, on behalf of District Ranger Eduardo Olmedo, signed the Decision Memo for the Tatham Project, authorizing the project under a "categorical exclusion" from NEPA.  Plaintiff commented on the Tatham Project and administratively appealed the Tatham Decision Memo to the Mendocino Forest Supervisor.  AR 00016 (found in AR 1A).  The Supervisor rejected plaintiff's administrative appeal.  AR 0001.

In April 2012, defendant USFS issued a "Biological Assessment" concluding that the Tatham Project "may affect but is not likely to adversely affect" the NSO and its critical habitat.  AR 222, 334.  In May 2012, FWS issued a letter stating:  "[W]e concur with your assessment

that the Project may affect, but is not likely to adversely affect northern spotted owl, [or] northern spotted owl critical habitat." FWS AR 009A.[3] Defendant has recently "reconsulted" with FWS, with the same conclusions. Exhibits A, B, C, D (attached to Dugan Decl.).[4] Specifically, FWS continues to concur that "the Tatham Ridge Fuels Reduction Project may affect, but is not likely to adversely affect the northern spotted owl or its critical habitat." Exhibit C at 2.

### 2. M9 Project

In late June 2012, District Ranger Eduardo Olmedo signed the Decision Memo for the M9 Project, authorizing the project under a "categorical exclusion" from NEPA. AR 528. Plaintiff commented on the M9 Project and administratively appealed the M9 Decision Memo to the Mendocino Forest Supervisor. AR 769. The Supervisor rejected plaintiff's administrative appeal. AR 755.

### 3. Log Springs Project

In late June 2012, District Ranger Eduardo Olmedo signed the Decision Memo for the Log Springs Project, authorizing the project under a "categorical exclusion" from NEPA. AR 655. Plaintiff commented on the Log Springs Project and administratively appealed the Log Springs Decision Memo to the Mendocino Forest Supervisor. AR 769.

The Supervisor rejected plaintiff's administrative appeal, asserting that plaintiff had not timely filed the administrative appeal. AR 755. Plaintiff asserts that it timely filed the administrative appeal.

### B. The Projects

---

[3] The Forest Service Administrative Record is split into five sections. The Fish and Wildlife Service (FWS) Administrative Record is a single section.

[4] Defendants have indicated that they will file these documents with the court soon as part of a supplemental administrative record.

1          **1.      Tatham Project**

2          The Tatham Project is located in the Buttermilk Late Successional Reserve (LSR),

3     Whiskey Saddle, and Thomes Creek Back Country, about seven miles west of Paskenta,

4     California.  Maps of the Tatham Project are found at FWS 0002P (showing fuelbreaks; LSR;

5     northern spotted owl (NSO) territories and home ranges, NSO nesting/roosting habitat, foraging

6     habitat, dispersal habitat, and "capable" habitat); FWS 014 (showing fuelbreaks, roads, and LSR,

7     as well as general area of Tatham project units); USFS 493 (FS AR section IC "Tatham map")

8     (showing Tatham project units); USFS 477 (FS AR section IC ("Resp to CC") (showing units).

9          The Tatham Project consists of about 900 acres of "shaded fuel break construction," 1800

10    acres of prescribed burning, and 1300 acres of plantation thinning.  AR 54 (FS section IB

11    "Appendix A").  The fuelbreak would be 6.2 miles long, up to 500 feet wide.  Id.  Vegetation

12    types include mixed chaparral (at lower elevations), mixed conifer (Ponderosa Pine, Sugar Pine,

13    Douglas Fir, Incense Cedar) and fir stands.  AR 55.

14         "Proposed treatments will affect forest structure on up to 3214 acres of northern spotted

15    owl habitat."  AR 45 (FS section IB "Decision Memo") at 5.

16         Almost half of the project is within the Buttermilk Late-Successional Reserve (LSR) –

17    338 acres of the proposed fuelbreak, 557 acres of thinning, and 675 acres of the prescribed

18    burning.  AR 45, DM at 4.

19         **2.      The M9 and Log Springs Projects**

20         The M9 and Log Springs projects are located within 10 to 15 miles southwest of the

21    community of Paskenta, California, near the M9 road.  A map of the M9 project is at FS AR 527

22    (FS section 2C "M9 Map").  Maps of the Log Springs project are at FS AR 690 (FS section 3B

23    "Log Springs com thin map") and AR 714 (FS section 3C "Log Springs scope map").

24         The Log Springs project involves commercially thinning about 70 acres of 50 to 70-year-

25    PAGE 4 - PLF'S BR. IN SUPP. OF MO. FOR PARTIAL SUMMARY JUDGMENT (NEPA)

1  old stands of planted ponderosa pine.  AR 655 (FS section 3B "Log Springs Decision Memo").

2  The M9 project involves harvest of about 250 acres of live trees which the Forest Service

3  states are "dying," as well as "dead" trees.  AR 528 (FS section 2B "M9_Sani_Salv_DM").

4  The Log Springs project is within the M9 project area.  See maps cited above.

5  A Late-Successional Reserve is adjacent to the Log Springs/M9 project area.  AR 529

6  (M9 Decision Memo at 2).

7  The M9/Log Springs project area contains habitat for northern spotted owl (NSO), a

8  species protected as threatened under the Endangered Species Act, and there is suitable NSO

9  habitat within a half mile of the project area.  AR 860 (FS section 4B "Wildlife BE") (NSO

10  habitat is within LSR); AR 811 (FS section 4B "Wildlife BA") (units are within half mile of

11  LSR).  It also contains habitat for sensitive species of bats, marten, fisher, and goshawk.  AR 848

12  (FS section 4B "Wildlife BE").

13  The Land and Resource Management Plan for the North Grindstone area notes that

14  potential habitat may exist for several plant species which the Forest Service has designated as

15  sensitive species.  AR 1634 (FS section 5 "LRMP Excerpts" at IV-191).

16  The designation of a species as sensitive arises from the Forest Service's obligations

17  under NFMA.  Ecology Center v. Austin, 430 F.3d 1057 (9th Cir. 2005).  Pursuant to 16 U.S.C.

18  1604(g)(3)(B), the Forest Service is required to "provide for diversity of plant and animal

19  communities."  The Forest Service's duty to maintain viable populations "applies with special

20  force to 'sensitive' species."  Friends of the Clearwater v. Dombeck, 222 F.3d 552, 556 n. 2 (9th

21  Cir. 2000) (citation and quotation omitted).

22  **C.     The Northwest Forest Plan**

23  The Forest Service amended the Mendocino Forest Plan ("Forest Plan") with a region-

24  wide 1994 Record of Decision – the "Record of Decision for Amendments to Forest Service and

25

Bureau of Land Management Planning Documents within the Range of the Northern Spotted Owl" – commonly known as the Northwest Forest Plan ("NFP").  The NFP sets forth standards and guidelines that are in addition to those set forth in the local Forest Plan.  The NFP was implemented, in part, to protect the northern spotted owl.

The Ninth Circuit recently summarized the history that led to the NFP:

> A careful reading shows that while the NFP as a whole seeks to strike a balance between environmental protection and resource extraction, its management directives for specified reserve areas give priority to environmental concerns. . . .
>
> Consider the NFP's history.  The Plan is a comprehensive response to a long and bitter legal battle over the scope of logging in old-growth forests, home to the endangered northern spotted owl.  See Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, 1300-01 (W.D. Wash. 1994), aff'd, Seattle Audubon Soc'y v. Moseley, 80 F.3d 1401 (9th Cir. 1996) (*per curiam*).  Indeed, "[i]t should be borne in mind that the NFP is not an ordinary government land-management strategy; instead, the history and care in its creation bespeak the massive effort that led to its birth."  Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv., 378 F.3d 1059, 1068 (9th Cir. 2004).

Oregon Natural Resources Council Fund v. Brong, 492 F.3d 1120, 1125-26 (9th Cir. 2007).

The NFP replaces only those standards and guidelines under existing Forest Plans which conflict with the NFP standards and guidelines; the standards and guidelines in the local Forest Plans apply where they are more restrictive or provide greater benefits to late-successional forest related species, subject to certain specific exceptions.  NFP Standards & Guidelines at A-6.[5]

### D.    Late-Successional Reserves

The NFP established Late Successional Reserves ("LSRs") -- areas in which logging and other ground-disturbing activities are generally prohibited to protect the ecosystem and conserve the northern spotted owl and other species.  The conservation strategy for the NSO established by USFS in the NFP includes the protection of these large blocks of habitat to facilitate the

---

[5]  The Standards & Guidelines (S&G) are available at
http://www.reo.gov/library/reports/newsandga.pdf

survival of clusters of breeding owl pairs, the distribution of protected areas across a variety of

ecological conditions, and the provision of suitable "connectivity habitat," within the

surrounding "matrix" of less protected lands, to support the movement of owls across the

landscape between reserves, thus increasing their chances for survival.  The Ninth Circuit

explained the importance of LSRs, in <u>ONRC v. Brong</u>:

> To ensure that national forest timber sales would comply with legal conservation requirements, the NFP divided the approximately 24.5 million acres of federal land within the northern spotted owl's range into several hierarchical allocations designated by the type of land use in each allocation.  <u>See</u> [<u>Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.</u>, 378 F.3d at 1068]; Northwest Forest Plan Standards and Guidelines ("NFP S & G") at A-1-A-7, B-1.  This hierarchy is the fundamental means by which the NFP achieves its primary goal of protecting and enhancing habitat for late-successional and old-growth forest-related species.  <u>See</u> <u>Seattle Audubon Soc'y</u>, 871 F. Supp. at 1304-05; NFP S & G at A-1.  Six of the allocations are "reserve areas in which logging and other ground-disturbing activities are generally prohibited."  <u>Seattle Audubon Soc'y</u>, 871 F. Supp. at 1304-05; <u>see also</u> NFP S & G at A-4-A-5 (summarizing what activities are permitted within each classification).  The Plan designates the remaining "unreserved areas as 'matrix,' in which timber harvest may go forward subject to environmental requirements."  <u>Seattle Audubon Soc'y</u>, 871 F. Supp. at 1305.

> . . . LSRs lie at the heart of the NFP's ecosystem-based conservation strategy for the northern spotted owl and other endangered species.  "The objective of Late-Successional Reserves is to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species including the northern spotted owl."  NFP S & G at C-9.  The NFP plainly states that LSRs "are to be managed to protect and enhance conditions of late-successional and old-growth forest ecosystems."  NFP S & G at C-11; <u>see also</u> Northwest Forest Plan Record of Decision ("NFP ROD") at 8 ("Late-successional reserves are to be managed to protect and enhance old-growth forest conditions.").

> Pursuant to these goals, the NFP makes programmed "stand management" activities, such as logging, impermissible in LSRs.  <u>See</u> NFP ROD at 8 ("No programmed timber harvest is allowed inside the reserves.").  The NFP recognizes a narrow exception, however, following a stand-disturbing event, such as a massive fire.  In these specific circumstances, the Plan contains "Guidelines for Salvage" that prescribe the extent to which limited logging within the LSRs is permitted.  NFP S & G at C-13-C-16.

<u>ONRC v. Brong</u>, 492 F.3d at 1126-27 [footnotes omitted].

The Mendocino National Forest's management emphasis for the Buttermilk Springs LSR

is on protecting and enhancing conditioned of late-successional and old-growth forest

ecosystems, which serve as habitat for old-growth related species including the northern spotted owl. The Buttermilk LSR is the largest LSR on the Forest and is a crucial link between Yolla Bolly-Middle Eel Wilderness on the north, the Grizzly LSR (RC 310) to the southwest and the Refuge LSR (RC 311) on the south. AR 1905 (FWS Biological Assessment, FWS AR009A). The Buttermilk LSR has been identified as the only fully functioning LSR within the Forest. AR 1906.

### E. Northern Spotted Owl (NSO)

Despite over 20 years of legal protection, defendant U.S. Fish and Wildlife Service (FWS) recently found that the Northern Spotted Owl (NSO) continues to decline steadily. <u>See</u> AR 2142, 2145, 2154 (Revised Recovery Plan, FWS AR 017).[6] The federal government continues to justify and allow the piecemeal destruction of its habitat.

In the Tatham Project, defendants U.S. Forest Service ("USFS") and FWS propose to allow the "short-term" degradation of NSO habitat (<u>see, e.g.</u>, Exhibit B at 5 (less than three years), 15 (same; and "short-term"), 16; Exhibit C at 13). Defendants do not acknowledge that their repeated allowance of such degradation creates a situation where "a listed species [can] be gradually destroyed, so long as each step on the path to destruction is sufficiently modest." <u>National Wildlife Fed. v. National Marine Fisheries Service</u>, 524 F.3d 917, 930 (9th Cir. 2008). <u>See also</u> <u>Pacific Coast Federation of Fishermen's Associations v. Nat'l Marine Fisheries Serv.</u>, 265 F.3d 1028 (2001) ("Given the importance of the near-term period on listed species survival it is difficult to justify NMFS's choice not to assess degradation over a time frame that takes into account the actual behavior of the species in danger."). Moreover, defendants overlook the fact that even an allegedly well-intended project, designed to benefit the NSO's habitat decades

---

[6] The full 2011 revised Recovery Plan is available online at http://ecos.fws.gov/docs/recovery_plan/RevisedNSORecPlan2011_1.pdf

1     hence, nonetheless degrades Owl habitat <u>immediately</u> – and for a species threatened with

2     extinction this short-term degradation may be all that matters.  The alleged long-term benefits of

3     a project are for naught if the species is extirpated during the project or while waiting for

4     asserted benefits to materialize.

5                    **1.**         **NSO within the Tatham project area**

6         Past surveys have detected NSO in the Tatham Project action area, and nine NSO activity

7     centers are documented in the project area; however, NSO surveys in the project area have not

8     been conducted since 2006.  AR 1909-10 (FWS AR 0009A).[7]

9                   **2.**         **Listing of NSO under the Endangered Species Act**

10         The northern spotted owl (NSO), *strix occidentalis caurina*, is a cavity nester that tends

11     to live its adult life in the same territory, and it is listed as threatened under the Endangered

12     Species Act (ESA).  55 Fed. Reg. 26114 (1990).  The listing of the NSO as threatened was

13     prompted in part by the loss of 60 to 88 percent of its habitat throughout its range, primarily due

14     to timber harvest and land conversions.  55 Fed. Reg. at 26175.

15                   **3.**         **NSO "critical habitat units" (CHU)**

16         Because the objective of the ESA is to enable listed species not merely to survive, but to

17     recover from their threatened or endangered status, Congress required the Secretary of the

18     Interior to designate protected "critical habitat" for all listed species to achieve this end.  16

19     U.S.C. 1533(a)(3); <u>Bennett v. Spear</u>, 520 U.S. 154, 157-58 (1997) ("[T]he objective of the ESA

20     is to enable listed species not merely to survive, but to recover from their endangered status.  To

21     achieve this objective, Congress required the Secretary of the Interior to designate a 'critical

22     ———————————

23         [7] An Activity Center (AC) is "the center of owl activity based on detections during surveys or incidental sightings."  "Home Range" is "an area of habitat within 1.3 miles radius of

24     an owl AC."  "Core" is an area within 0.5 miles of an owl AC.  AR 1901 (Tatham BA, FWS AR009A).

25     

habitat' for all listed species.").

FWS delineated the critical habitat for the NSO in 1992 after being ordered to do so by the federal courts, 57 Fed. Reg. 1796 (1992); Northern Spotted Owl v. Lujan, 758 F. Supp. 621 (W.D. Wash. 1991), and has updated the critical habitat designation since then, in 2008 and 2012. Ex. C at 1-2. The FWS' primary objective in designating critical habitat for the NSO was to identify existing NSO habitat and to designate and protect specific areas where NSO habitat management should be given highest priority.

In 2008, FWS revised its critical habitat designation for the Northern Spotted Owl, reducing by approximately one-third the amount of land in northern California that it considered critical habitat for the Owl. 73 Fed. Reg. 47326 (2008). The Tatham Project area continues to contain some designated critical habitat, as well as NSO activity centers. Ex. B at 11-12.

In September 2010, the U.S. District Court for the District of Columbia entered an order requiring FWS to re-consider its 2008 rule revising the Owl's critical habitat and issue a new proposed critical habitat rule within nine months. Carpenters' Industrial Council v. Salazar, 734 F. Supp. 2d 126 (D.D.C. 2010). The deadline was later extended to November 15, 2011, with final critical habitat rule due by November 15, 2012. 76 Fed. Reg. 38576 (2011) (citing orders in Carpenters case, D.D.C. No. 1:08-cv-1409). In December 2012, FWS issued the final critical habitat rule. 77 Fed. Reg. 71876 (2012).

Critical habitat is defined as:

(i) the specific areas within the geographic area occupied by the species, at the time it is listed in accordance with the [ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographic area occupied by the species at the time it is listed in accordance with the [ESA], upon a determination by the Secretary that such areas are essential for the conservation of the species.

1    16 U.S.C. 1532(5)(A).

2        As in listing decisions, in decisions to designate critical habitat, FWS must make its

3    decision "on the basis of the best scientific data available." 16 U.S.C. 1533(b)(2).  However,

4    unlike listing decisions, in designating critical habitat FWS must also consider "the economic

5    impact, and any other relevant impact of specifying any particular area as critical habitat."  Id.

6        FWS "may exclude any area from critical habitat if [it] determines that the benefits of

7    such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless

8    [it] determines, based on the best scientific and commercial data available, that the failure to

9    designate such area as critical habitat will result in the extinction of the species concerned."  Id.

10            **4.    NSO habitat within the Tatham project area**

11        The entire Buttermilk LSR was designated as critical habitat (CHU) for the NSO.  It is

12    unclear from the recent critical habitat designation whether this continues to be true.  Of the nine

13    NSO activity centers in the action area, all are severely below recommended FWS habitat

14    thresholds for home range and core.  AR 1910-11 (FWS AR009A).

15            **5.    Amount of NSO habitat that will be affected by the Tatham project**

16

17        Logging for the Tatham Project would occur in most of the nine NSO activity centers.

18    The Tatham Project will "degrade" 437 acres of NSO nesting/roosting habitat, 760 acres of

19    foraging habitat; and 2,016 acres of dispersal habitat, for a total of 3,213 acres degraded NSO

20    habitat.  AR 1931 (BA – FWS AR 009A).  The Project will also "remove" six acres of NSO

21    habitat to produce log landings, resulting in "long-term loss of forested cover" according to

22    USFS.  AR 1895, 1921 (FWS AR 009A).  Of the 26,950 Tatham Project "action area" acres, 26

23    percent (and 38 percent of the national forest land within that action area) are within the

24    Buttermilk LSR.  AR 1905.  13 percent of the Tatham treatment sites would be in NSO

25    PAGE 11 - PLF'S BR. IN SUPP. OF MO. FOR PARTIAL SUMMARY JUDGMENT (NEPA)

nesting/roosting habitat and 22 percent would be in foraging habitat.  AR 1913.

### 6.    Impact of fuelbreaks on NSO habitat in the Tatham project area

Fuelbreaks by definition require the "removal" of habitat under FWS definitions.  The proposed 6.2-mile-long, 500-foot wide fuelbreak for the Tatham Project would occur in parts of four NSO activity centers (two of which overlap), including a significant amount of nesting/roosting and foraging habitat.  AR 1914 (FWS AR009A).

In general, fuelbreaks have to be re-entered every 10 to 20 years, thereby continually negatively affecting owl habitat.  AR 24.

### 7.    Recovery planning for the Northern Spotted Owl

In 2008, FWS issued an ESA Recovery Plan for the NSO.  73 Fed. Reg. 29471 (2008).  That Plan was challenged in court, and FWS moved the U.S. District Court for the District of Columbia to vacate and remand the Recovery Plan to it for further review.  In September 2010, FWS released a new draft revised Recovery Plan for the NSO.  75 Fed. Reg. 56131 (2010).  In July 2011, FWS issued a final revised Recovery Plan for the NSO ("2011 Recovery Plan").  76 Fed. Reg. 38575 (2011).

The 2011 Recovery Plan recognizes "past habitat loss and competition from Barred Owls, *Strix varia*, as the most pressing threats to spotted owl persistence."  Id.  To address these threats, the 2011 Recovery Plan recommends increased habitat protection for the Owl in both occupied and unoccupied areas.  The 2011 Recovery Plan requires additional analysis of impacts to the NSO resulting from projects which impact its prey species and cautions that "active management projects" like the Tatham timber sale should explicitly evaluate the short-term impacts to the NSO and its prey while considering alleged long-term ecological benefits of such projects.  AR 2165, 2168, 2169-70.

FWS's 2011 survey protocol for NSO requires three visits to each owl site in order to

better detect spotted owls and barred owls.  AR 2406, 2410, 2411 (FWS 018).  The 2011 Recovery Plan states that treatment

> should avoid existing high value habitat, if possible, while meeting long-term restoration goals . . . [and] should first focus on areas of younger forest less likely to be used by spotted owls and less likely to develop late-successional forest characteristics without vegetation management.

AR 2172.  The Revised Recovery Plan states:

> The objectives of this Revised Recovery Plan are:
>
> 1. Spotted owl populations are sufficiently large and distributed such that the species no longer requires listing under the ESA;
>
> 2. Adequate habitat is available for spotted owls and will continue to exist to allow the species to persist without the protection of the ESA; and
>
> 3. The effects of threats have been reduced or eliminated such that spotted owl populations are stable or increasing and spotted owls are unlikely to become threatened again in the foreseeable future.

AR 2127.

## 8.    Current status of NSO

Despite over 20 years of legal protection, the Northern Spotted Owl continues to decline.

See AR 2142, 2145, 2154.   As FWS recently explained in the 2011 Revised Recovery Plan:

> After a status review . . . , the spotted owl was listed under the Endangered Species Act (ESA) as threatened on June 26, 1990 . . . because of widespread loss of spotted owl habitat across the spotted owl's range and the inadequacy of existing regulatory mechanisms to conserve the spotted owl.  Past habitat loss and current habitat loss are also threats to the spotted owl, even though loss of habitat due to timber harvest has been greatly reduced on Federal lands over the past two decades.  Many populations of spotted owls continue to decline, especially in the northern parts of the subspecies' range, even with extensive maintenance and restoration of spotted owl habitat in recent years.  Managing sufficient habitat for the spotted owl now and into the future is important for its recovery. . . .
>
> Scientific research and monitoring indicate spotted owls generally rely on mature and old-growth forests because these habitats contain the structures and characteristics required for nesting, roosting, and foraging.  Although spotted owls can disperse through highly fragmented forested areas, the stand-level and landscape-level attributes of forests needed to facilitate successful dispersal have not been thoroughly evaluated or described.

. . . .

Currently, the most important range-wide threats to the spotted owl are competition with barred owls, ongoing loss of spotted owl habitat as a result of timber harvest, habitat loss or degradation from stand replacing wildfire and other disturbances, and loss of amount and distribution of spotted owl habitat as a result of past activities and disturbances.

AR 2124-25 (Revised Recover Plan at vi-vii).

Historically, the NSO ranged in structurally complex forests, commonly referred to as "old growth" forests, from southwest British Columbia through the Cascade Mountains and coastal ranges in Washington, Oregon and California, as far south as Marin County, California. AR 2124. Today, with the destruction of most old growth forests, the Owl's range and populations are dramatically reduced.

**F.    USFS Rationale for the Tatham Project**

USFS justifies the logging within NSO habitat by presenting concerns about the possibility of fire affecting the LSR, noting that fuels have increased with fire suppression. The biggest fire threat is likely from the southern end of the action area, which has lower quality NSO habitat and a sizable amount of chaparral; USFS states "likelihood of a fire start from this area is high," since it is at lower elevation and has very flammable vegetation. AR 1928 (FWS AR009A). USFS acknowledges that the great majority of past fires in the area have started in brush or grass. AR 198-99 (FS AR section IB "Fuels Rept"). The Forest claims there will be long term beneficial results from the Tatham project but fails to cite any time frame.

**G.    Mendocino Forest Plan Inventory and Monitoring Requirements**

The Mendocino Forest Plan requires USFS to "[c]onduct necessary inventory and monitoring activities within each LSR to determine population densities and habitat trends for wildlife species dependent on older mature forested habitats." AR 1628 (FS section 5, "LRMP" at IV-67). There is no evidence that the USFS has conducted the inventory and monitoring to

1    determine the population densities and habitat trends of the NSO within the Buttermilk LSR.

2    **H.    Cumulative Impacts to NSO and Baseline**

3         Analysis of impacts to species under the ESA requires review of the "environmental

4    baseline" for the species.  50 C.F.R. 402.02; <u>Nat'l Wildlife Fed.</u>, 524 F.3d 917.

5         In addition to the impacts of the Tatham Project itself, the cumulative  impacts of this

6    project combined with other federal projects within the Buttermilk LSR (which must be

7    addressed under NEPA, 40 C.F.R. 1508.7, 1508.25(a)(2)), may affect the NSO, including the

8    Smokey Project, Sugar Project, Hardin Fuels Project, Snow Basin Timber Sale, and Brewer's

9    Fuels Project.  AR 21.  These other federal projects being planned or carried out collectively

10    cover 71 percent of the LSR/CHU.  <u>Id</u>.

11         Under its own rules, USFS cannot "treat" (log) more than 25% of suitable owl habitat

12    within a home range per year and cannot treat more than 35% suitable habitat in the core areas of

13    activity centers.  AR 1924.  Based on the number of past, current, and foreseeable actions, it

14    appears likely that more than 25% of the home ranges and 35% of the core areas of the activity

15    centers will be treated within a single year.

16    **II.    STANDARD FOR SUMMARY JUDGMENT**

17         The Court should grant summary judgment if there are no genuine issues of material fact

18    and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

19    substantive law governing a claim or defense determines whether a fact is material.  <u>T.W. Elec.</u>

20    <u>Serv., Inc. v. Pacific Elec. Contractors Ass'n.</u>, 809 F.2d 626, 630 (9th Cir. 1987).  The Court

21    must view the facts in the light most favorable to the non-moving party.  <u>Oliver v. Keller</u>, 289

22    F.3d 623, 626 (9th Cir. 2002).

23         The Court's review of the NEPA claims is governed by the Administrative Procedure Act

24    (APA).  The APA provides that "[a] person suffering legal wrong because of agency action, or

25

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof." 5 U.S.C. 702. The APA provides "the reviewing court shall

. . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . .

arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," 5

U.S.C. 706(2)(A), or which have been taken "without observance of procedure required by law,"

5 U.S.C. 706(2)(D).

Applying this standard, a court must determine whether the agency "considered the

relevant factors, [] articulated a rational connection between the facts found and the choice

made," and took a "hard look" at the environmental consequences of the project. Baltimore Gas

& Elec. Co. v. NRDC, 462 U.S. 87, 105 (1983); Blue Mountains Biodiversity Project v.

Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998). Courts review whether the agency:

> Has relied on factors which Congress has not intended it to consider, entirely failed to
> consider an important aspect of the problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or be the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto., 463 U.S. 29, 43 (1983). See also NRDC

v. Dept. of the Interior, 113 F.3d 1121, 1124 (9th Cir. 1997).

Although the "arbitrary and capricious" standard of review applied in APA cases is

deferential, the agency must "articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made,'" and this Court must

"consider whether the decision was based on a consideration of the relevant factors and whether

there has been a clear error of judgment." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (1983)

(citations omitted). "Agency deference has not come so far that we will uphold regulations

whenever it is possible to 'conceive a basis' for administrative action." Bowen v. American

Hosp. Ass'n, 476 U.S. 610, 626, 106 S. Ct. 2101, 2112 (1986). Reviewing courts must not

merely "rubber-stamp administrative decisions." Ocean Advocates v. U.S. Army Corps of

Engineers, 361 F.3d 1108, 1119 (9th Cir. 2004). Under the Administrative Procedures Act, the

1  Court is to consider whether the Forest Service's decision "was based on a consideration of the

2  relevant factors and whether there has been a clear error of judgment." Idaho Sporting Congress

3  v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998).

**ARGUMENT**

**I.    PLAINTIFFS HAVE STANDING**

As demonstrated in the Declarations of Denise Boggs, the plaintiff group has standing to

bring this action.  See Pit River Tribe v. U.S. Forest Service, 469 F.3d 768, 779 (9th Cir. 2006)

("representational standing" regarding members; "Once a plaintiff has established an injury in

fact under NEPA, the causation and redressability requirements are relaxed. . . . "[T]he members

must show only that they have a procedural right that, if exercised, could protect their concrete

interests"); Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 335, 343 (1977)

("organizational standing").

**II.   DEFENDANT IMPROPERLY USED A "CATEGORICAL EXCLUSION" FROM
       NEPA AND FAILED TO DISCLOSE AND ANALYZE IMPACTS AS REQUIRED
       BY NEPA**

**A.    The National Environmental Policy Act**

NEPA is our "basic national charter for protection of the environment."  40 C.F.R.

1500.1(a).  NEPA has "twin aims."  First, it requires federal agencies "to consider every

significant aspect of the environmental impact of a proposed action.  Second, it ensures that the

agency will inform the public that it has indeed considered environmental concerns in its

decisionmaking process."  Kern v. BLM, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting

Baltimore Gas, 462 U.S. at 97).

NEPA and its implementing regulations promulgated by the Council on Environmental

Quality require federal agencies to prepare an environmental impact statement ("EIS') for "every

recommendation or report on proposals for legislation and other major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C. 4332(2)(C), 40 C.F.R.

1508.11.  The primary purpose of an EIS "is to serve as an action-forcing device to insure that

1  the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of

2  the Federal Government." 40 C.F.R. 1502.1. If the agency does not decide to prepare an EIS

3  from the outset, it must prepare an Environmental Assessment (EA), which must "[b]riefly

4  provide <u>sufficient</u> evidence and analysis for determining whether to prepare an environmental

5  impact statement or a finding of no significant impact," as well as "brief discussions of the need

6  for the proposal, of alternatives as required by sec. 102(2)(E), [and] of the environmental

7  impacts of the proposed action and alternatives." 40 C.F.R. 1508.9. <u>See also</u> 40 C.F.R.

8  1502.9(c)(1)(ii).

9      "NEPA procedures must insure that environmental information is available to public

10  officials and citizens before decisions are made and before actions are taken . . . . Accurate

11  scientific analysis, expert agency comments, and public scrutiny are essential to implementing

12  NEPA." 40 C.F.R. 1500.1(b).

13      NEPA requires federal agencies to analyze the direct, indirect, and cumulative impacts of

14  proposed actions. 40 C.F.R. 1508.7 & 1508.8.

15      The three federal timber sale projects are major federal actions as defined by NEPA. 40

16  C.F.R. 1508.18 (defining major federal actions as "actions . . . potentially subject to Federal

17  control and responsibility"). The Forest Service authorized the three projects at issue in this case

18  under various "categorical exclusions" from NEPA.

19      NEPA generally requires federal agencies to prepare an Environmental Impact Statement

20  ("EIS") or an Environmental Assessment ("EA") to evaluate the environmental impacts of

21  proposed major federal actions. 42 U.S.C. 4332(2)(C); 40 C.F.R. 1508.9(a)(1).

22      **B.      Categorical Exclusions**

23      In narrow situations, neither an EA nor an EIS is required and federal agencies may

24  invoke a "categorical exclusion" ("CE") from NEPA. 40 C.F.R. 1508.4. A "categorical

1  exclusion" is defined as "a category of actions which do not individually or cumulatively have a

2  significant effect on the human environment and which have been found to have no such effect

3  in procedures adopted by a Federal agency in implementation of these regulations."  40 C.F.R.

4  1508.4.  Each federal agency must develop "specific criteria for and identification of" actions

5  that qualify for a CE.  40 C.F.R. 1507.3.

6       The Forest Service has developed criteria for categorically excluded activities in its

7  "Environmental Policy and Procedures Handbook" ("Forest Service Handbook," "Handbook," or

8  "FSH").  The Handbook is available at http://www.fs.fed.us/im/directives/dughtml/fsh_1.html

9  Section 1909.15 of the Forest Service Handbook discusses what constitutes an appropriate use of

10  CE's and specifically documents the agency's list of categorically excluded activities.

11       Even if an action fits within a CE category, the Forest Service "must determine that there

12  are no extraordinary circumstances in which a normally excluded action may have a significant

13  environmental effect" before the agency can forego an EA or EIS.  73 Fed. Reg. 43084, 43091

14  (2008); see also 36 C.F.R. 220.6(a).  Federal agencies are therefore required to "provide for

15  extraordinary circumstances in which a normally excluded action may have a significant

16  environmental effect."  40 C.F.R. 1508.4.  In promulgating its CE's, the Forest Service has

17  acknowledged that a CE may be used for "only routine actions that have no extraordinary

18  circumstances."  57 Fed. Reg. 43180 (1992).  The Forest Service has defined routine as: "the

19  activity will have little potential for soil movement, loss of soil productivity, water and air

20  degradation or impact on sensitive resource values and is consistent with Forest land and

21  resource management plans."  56 Fed. Reg. 19718 (1991).

22       Where a project area contains extraordinary circumstances related to the proposed action,

23  the Forest Service may not invoke a CE and instead must prepare an EA or an EIS.  The

24  "extraordinary circumstances" that  must be considered include, but are not limited to:

25

a.  Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species.

b.  Flood plains, wetlands, or municipal watersheds.

c.  Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas.

d.  Inventoried roadless areas.

e.  Research natural areas.

f.  American Indians and Alaska Native religious or cultural sites.

g.  Archaeological sites, or historic properties or areas.

FSH 1909.15, § 30.3 ¶ 2.

"[T]he fact that the exceptions may apply is all that is required to prohibit the use of the categorical exclusion." State of California v. Norton, 2002 WL 31681515 at *13 (9th Cir. 2002) (citing 49 Fed. Reg. 21439 (1984)). See also Alaska State Snowmobile Ass'n, Inc. v. Babbitt, 79 F. Supp. 2d 1116 (D. Alaska 1999); Rhodes v. Johnson, 153 F.3d 785 (7th Cir. 1998) (presence of an extraordinary circumstance requires the Forest Service to prepare an NEPA analysis).

"A categorical exclusion . . . is appropriate only when the agency determines that the proposed action will have 'no effect' on the environment." Riverhawks v. Zepeda, 228 F. Supp. 2d 1173, 1189-90 (D. Or. 2002) (citing 40 C.F.R. 1508.4) (potential for impacts on turtles and salmon, as well as conflicts between various user groups, precluded use of CE). See also Heartwood, Inc. v. United States Forest Serv., 230 F.3d 947, 954 (7th Cir. 2000) ("categorical exclusions, by definition, do not have a significant effect on the quality of the human environment").

**C.  Defendant's Use of a CE for the Tatham Project is Inappropriate and Violates NEPA**

Defendant USFS invoked its Categorical Exclusion 6:

Timber stand and/or wildlife habitat improvement activities which do not include the use of herbicides or do not require more than one mile of low standard road construction (Service level D, FSH 7709.56). Examples include but are not limited to:

a. Girdling trees to create snags.

b. Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand.

c. Prescribed burning to control understory hardwoods in stands of southern pine.

d. Prescribed burning to reduce natural fuel build-up and improve plant vigor.

FSH 1909.15, chapter 31.2. <u>See also</u> 36 C.F.R. 220.6.

The "extraordinary circumstance" of an ESA-listed species (NSO) and its habitat is "related to" the Tatham Project, as discussed in the fact section above. Therefore, it was inappropriate to use a categorical exclusion. <u>State of California</u>, 2002 WL 31681515 at *13; <u>Alaska State Snowmobile Ass'n</u>, 79 F. Supp. 2d 1116; <u>Rhodes</u>, 153 F.3d 785. The agency's own regulations dictate that if "it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA." 36 C.F.R. 220.6(c).

The examples in the CE itself illustrate the intended meaning and scope of the CE, under the doctrine of *ejusdem generis* (the general term should be defined in light of the specific examples provided). <u>Circuit City Stores, Inc. v. Adams</u>, 532 U.S. 105 (2001); <u>see</u> <u>Cal. ex reI. Lockyer v. USDA</u>, 575 F. 3d 999, 1017 (9th Cir. 2009) (Forest Service use of a CE for rules and regulations invalidated because all of the CE's examples involved routine procedures which were "far less likely to significantly affect the environment" than the litigated rule, which was of much wider scope and impact, so the litigated rule could not have been authorized by that CE).

A comparison of other categories in the same sub-section of the regulation as CE 6, 36 C.F.R. 220.6(e), also shows that CEs are intended for smaller-scale projects of shorter duration

than Tatham. For example, section 220.6(e)(3) is restricted to activities that do not involve more than five contiguous acres. In contrast, as discussed *supra,* the Tatham sale is <u>thousands</u> of acres, and the M9 and Log Springs sales (contiguous to each other) are hundreds of acres, without even considering the cumulative impacts of other sales. Sections (e)(1)-(2) of the CE regulations address narrow trail and phone or power line construction or reconstruction; (e)(5) applies to planting trees; (e)(7) involves maintaining existing aquatic habitat improvement structures; (e)(8) is for short-term (1 year or less) geophysical investigations; and (e)(9) only concerns "minor management practices" on existing grazing allotments.

The timber harvest categories are also very limited in size and scope: (e)(12) is for harvests of live trees not to exceed 70 acres and cannot be used for even-aged regeneration or vegetation type conversion; (e)(13) is for salvage of dead and/or dying trees on 250 acres or less; and (e)(14) concerns harvest of trees to control insects or disease "not to exceed 250 acres." All three categories are a far cry from the proposed action's thousands of acres of timber harvest. The type of work planned for Tatham is very similar to that allowed by the timber harvest CEs, but significantly exceeds their acreage caps. Tatham, involving logging, possibly other vegetation management such as midstory thinning or removal, and burning, also is more complex and longer-term than the actions contemplated by the harvest CEs.

The boundaries of these other categories provide context for the CE and are highly relevant to determining the proper scope and use of the CE. See <u>West v. Secretary of DOT</u>, 206 F.3d 920, 928 (9th Cir. 2000) (agency should not have applied a particular CE to a disputed project, because none of the other CEs in the same regulatory section approached the magnitude of the project, therefore the agency must have intended "a very different scale of project to escape the more detailed environmental review" in an EA.).

The Forest Service's past use of CEs also sheds light on the intended use of CE 6 and

shows that the Tatham project is not the type of project intended to be categorically excluded.

See Cal. ex rel. Lockyer 575 F. 3d 999 (because agency previously had used a CE only for routine matters, agency itself must have interpreted the CE's scope to be "more modest" than the litigated rule). The Tatham project is much larger and more complex and longer-term.

CE 6 evolved from two CEs that are no longer in existence:

1) "Low-impact silvicultural activities that are limited in size and duration and that primarily use existing roads and facilities, such as firewood sales; salvage, thinning, and small harvest cuts; site preparation; and planting and seeding." "Low-Impact Silvicultural CE," FSH 1952.2 (4).

2) "Fish and wildlife management activities, such as improving habitat, installing fish ladders, and stocking native or established species." "Fish and Wildlife CE," FSH 1952.2 (9).

50 Fed. Reg. 26078 (1985).

The CEs scoped and issued at the same time as the Low-Impact Silvicultural CE and the Fish and Wildlife CE included exemptions from NEPA's requirements when the Forest Service controlled poisonous plants in campgrounds, removed small mineral samples, and constructed picnic facilities – all mundane tasks with little chance of causing significant impacts either individually or cumulatively. See 50 Fed. Reg. 26078 (1985).

At the time the Low-Impact Silvicultural CE was adopted, the Forest Service provided assurance to commenters concerned about abuse of the broadly-worded authority, stating that "[t]he guiding principal is that the depth and breadth of the environmental analysis, the extent of public involvement, and the type of documentation for a proposed action must be commensurate with the scale and intensity of the anticipated effects." 50 Fed. Reg. 26078 (1985). Only where "both past experience and environmental analysis demonstrate that no significant effects on the human environment will result, individually or cumulatively (FSM 1952.2)" would actions be excluded from documentation. Id.

1    The final language of CE 6 was adopted in 1992.  See 57 Fed. Reg. 43180 (1992).  Once

2    again, the Forest Service made clear that "[t]he intent of the agency is that only routine actions

3    that have no extraordinary circumstances should be within categories for exclusion."  Id.  During

4    scoping for the language change, the agency defined a routine action as one which "will have

5    little potential for soil movement, loss of soil productivity, water and air degradation or impact

6    on sensitive resource values and is consistent with Forest land and resource management plans."

7    56 Fed. Reg. 19718 (1991).

8        The historical justification for CE 6 is important because "CEQ [Council on

9    Environmental Quality] must review all CE's before the Forest Service adopts them to assure the

10   CE's compliance with CEQ and NEPA regulations."  Heartwood, Inc. v. United States Forest

11   Serv., 73 F. Supp. 2d 962, 966 (D. Ill., 1999).  See also 48 Fed. Reg. 34263 (1983) ("Categorical

12   exclusions promulgated by an agency should be reviewed by the Council at the draft stage.").

13   "Agencies shall continue to review their policies and procedures and in consultation with the

14   Council to revise them as necessary to ensure full compliance with the purposes and provisions

15   of the Act."  40 C.F.R. 1507.3.  Since the CEQ must approve CEs and revisions are to be made

16   in consultation with CEQ, only those actions contemplated at the time of approval as falling

17   under a CE can be validly excluded from normal NEPA procedural requirements without further

18   consultation.  Any other reading would render the CEQ review meaningless.

19       At the same time CE 6's final language was adopted, the final language for a Timber

20   Harvest CE was also adopted.  Like CE 6, the Timber Harvest CE evolved out of the Low-

21   Impact Silvicultural CE and the Fish and Wildlife CE.  See 57 Fed. Reg. 43180.  CE 6 and the

22   Timber Harvest CE could be described as fraternal twins, so similar were their births,

23   justification, and evolution.  The Timber Harvest CE allowed the removal of up to 250,000 board

24   feet of "merchantable wood products" or salvage of up to 1,000,000 board feet where there was

25

only one mile or less of low standard road construction."  57 Fed. Reg. 43180 (1992).  Examples

of application of the timber harvest CE included harvesting "60,000 board feet of merchantable

timber from 100 acres, including the construction of one-half mile of additional roads," or

"thinning an estimated 200,000 board feet of timber from over-stocked timber stands, which

requires construction of one-quarter mile of additional access road."  Heartwood, Inc. v. United

States Forest Serv., 73 F. Supp. 2d 962 (S.D. Ill.1999).

      Use of the timber harvest CE was later enjoined as the result of a suit brought by

Heartwood because:

> the FS failed to adequately address or provide support for its position that the timber
> harvests of these magnitude [sic] would not have cumulative effects on the environment.
> "'Cumulative impact' is the impact on the environment which results from the
> incremental impact of the action when added to other past, present, and reasonably
> foreseeable future actions . . . .'  40 C.F.R. 1508.7.  The Court does not accept the circular
> argument that the extraordinary circumstances provision (FSH 1909.15 § 30.3(3))
> adequately addresses the issue of cumulative effects.

Heartwood, 73 F. Supp. 2d 962.  "The Forest Service is mandated to consider these cumulative

effects prior to the implementation of a CE, not afterward.  The Court cannot discover any

meaningful analysis providing support for the Forest Service's conclusion that the categorical

exclusion of timber harvests of this magnitude would not have cumulative effects on the

environment."  Id. at 976-77.  The language of CE 6 is even more vague than that of the former

Timber Harvest CE, which at least included an acreage cap.

      The application of CE 6 to the Tatham project is identical to the use of the former CE

that was enjoined in Heartwood.  The Heartwood court expressed concern that "hundreds and

possibly thousands of acres of national forest land" might be affected by the timber harvest CE.

Heartwood at 979.  The number of acres affected by CE6 is orders of magnitude larger.

      It was arbitrary and capricious for the Forest Service to apply CE 6 to the non-routine

Tatham Timber Sale, which is "likely to adversely affect" endangered species habitat.

**D.      Defendant's Use of a CE for the M9 and Log Springs Projects is Inappropriate and Violates NEPA**

The "extraordinary circumstances" of an ESA-listed species (NSO) and its habitat is also "related to" the M9 and Log Springs Projects. In addition, the "extraordinary circumstances" of a Forest Service sensitive species is "related to" these two projects.

Therefore, it was inappropriate to use a categorical exclusion. State of California; Alaska State Snowmobile Ass'n; Rhodes.

Furthermore, as discussed infra, both projects are in the same area, and all of the Log Springs units are immediately adjacent or very near the western units of M9. The projects were approved on the same date, and the specialist reports which USFS prepared cover both projects. Yet the Forest Service chose to approve the projects in separate decision memos. If the two projects were combined, as they should have been, the CEs could not have been used.

The combined acreage of the two projects is approximately 320 acres – 70 acres for Log Springs and 250 acres for M9. AR 655, 528. The CE which was used is 36 C.F.R. 220.6(e)(12), which is limited to projects with harvest of no more than 70 acres of live trees. AR 531, 658. M9 was approved with three CEs, two of which, 36 C.F.R. 220.6(3)(13) and (14), have an acreage limitation of 250 acres. Id.

For M-9 defendants also cited another CE, section 220.6(e)(5), which is for regeneration of native trees species. Id. But this CE cannot be applied here because the purpose of the project is not just regeneration, but also to "partially fulfill the Mendocino National Forest's annual sale target in the year it is sold and meet the purpose and need for timber productivity." AR 529. See also AR 570 (FS section 2B "silviculture rept") (project is "primarily designed to recover the economic value of salvageable dead trees"). Regeneration is not even mentioned by defendant as an objective. Furthermore, the project will log three times more green timber than dead material, yet the Forest is calling the project a sanitation salvage project.

PAGE 26 - PLF'S BR. IN SUPP. OF MO. FOR PARTIAL SUMMARY JUDGMENT (NEPA)

1   The regeneration CE cited in the M9 DM is geared toward planting.  See 36 C.F.R.

2   220.6(e)(5)(i) and (ii).  It does not appear intended for use in a project where logging is the

3   primary purpose, as is the case with M9.

4          It is clear that the Forest Service separated these two projects in order to avoid preparing

5   a NEPA analysis document (EA or EIS).  As discussed infra, cumulative impacts to northern

6   spotted owl (NSO) from a large number of projects near M9 and Log Springs may be significant.

7          **E.      The Decision Memos Are Not a Substitute for a NEPA Analysis Document**

8          The three project Decision Memos themselves do not serve as substitutes for an EA or

9   EIS.  For example, in the Tatham DM, while there is some discussion of the possible cumulative

10  impacts of some of the other federal projects within the LSR/CHU, there is no collective

11  determination of the impacts to NSO or its habitat.  The Forest Service has piecemealed the

12  consideration of impacts on NSO by making determinations of effect only on the individual

13  projects, not on how they might affect the owl collectively.

14         Because USFS relied upon categorical exclusions, USFS also did not consider reasonable

15  alternatives to the proposed action, as would be required for an EA or EIS (such as an alternative

16  that would consider chaparral and other flammable vegetation in the southern portion of the

17  action area, and left the higher quality NSO habitat to the north alone; or dead tree retention for

18  snags which are important to NSO).  40 C.F.R. 1502.14(a).

19  **III.    DEFENDANT FAILED TO DISCLOSE AND ANALYZE CUMULATIVE
            IMPACTS AS REQUIRED BY NEPA**

20         NEPA requires federal agencies to analyze the foreseeable environmental impacts,

21  including direct, indirect, and cumulative impacts of major federal actions.  42 U.S.C.

22  4332(c)(I); 40 C.F.R. 1508.7.  NEPA requires the analysis and consideration of cumulative

23  effects which result from the incremental impact of the action when added to other past, present,

24  and reasonably foreseeable future actions.  40 C.F.R. 1508.25(a).  The CEQ regulations for

25

NEPA repeatedly make this requirement clear.  For example, the regulations state that in evaluating the "intensity" of the project (a factor as to whether a full EIS is required), the agency must consider

> [w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  <u>Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts</u>.

40 C.F.R. 1508.27(b) (emph. added).

The Decision Memos for the three timber sales violate NEPA because they fail to account for the cumulative effect of the three projects together, and the other past, present, and reasonably foreseeable timber sales and other ground-disturbing activities.

## A.    Tatham

The Tatham Ridge Fuels Project would occur on the Grindstone Ranger District of the Mendocino National Forest. The project area is 7 miles west of Paskenta, CA, and has the following legal description:  Township 24 N, Range 8 W, sections 3, 10, 11, 14-16, 22-27, and 34-36. Elevation of proposed treatment units ranges from 3300 to 6500 feet.

Under the project approved in the Decision Memo (DM) signed by Acting District Ranger, Victoria Stoll on May 25, 2012, the following would occur:  Approximately 900 acres of shaded fuelbreak construction, 1800 acres of prescribed burn, and 1300 acres of plantation thinning. Some areas would get more than one treatment.

Almost half of the project (44%  – AR 1896) occurs in the Buttermilk Late Successional Reserve, all of which was desigated as habitat for northern spotted owl. The remainder would be in the Whiskey Saddle/Whitlock/Three Prong management area.

The BA concludes that the Tatham project "may affect but is not likely to adversely affect" the NSO  (AR 1933), or its critical habitat (AR 1944).  However, there are other projects

1   in various stages of approval or implementation within the Buttermilk LSR that may affect NSO

2   or its critical habitat, including Smokey and Sugar.  AR 1942.  Also, the Hardin Fuels Project,

3   Snow Basin Timber Sale, and Brewer's Fuels Project are all in the same LSR and critical habitat

4   unit (CHU), and collectively cover 71 percent of the LSR/CHU.  These projects are certainly

5   "reasonably foreseeable," as well as current since final implementation for some projects has yet

6   to occur.  The cumulative impact to NSO and its critical habitat/ LSR must be analyzed.

7          While there is some discussion of the possible cumulative impacts of Tatham, Smokey,

8   and Sugar in the Tatham BA (but not of any of the other three projects - AR 1942-43), there is

9   no collective determination of the impacts to NSO or its critical habitat.  In other words, the

10  Forest Service has piecemealed the consideration of impacts on NSO by making determinations

11  of effect only on the individual projects, not on how they might affect the owl collectively.

12         The Project was approved with a categorical exclusion (CE) and decision memo (DM).

13  Under the Forest Service's NEPA procedures regulations, the following must be considered

14  when determining what type of NEPA document is needed for a project or activity:

15         Federally listed threatened or endangered species or designated critical habitat, species
           proposed for Federal listing or proposed critical habitat, or Forest Service sensitive
16         species…

17  36 C.F.R. 220.6(b)(1)(i).

18         A species listed as threatened under the Endangered Species Act, Northern Spotted Owl

19  (NSO), is present,[8] and habitat for this species is present in the action area.  Of an action area of

20  26,950 acres (AR 1904), 26 percent of the total area and 38 percent of the national forest land are

21

22

23         [8] Past surveys have detected NSO in the action area, but, as is discussed below, no recent
    surveys for this species have been conducted in the project area, although 9 ACs are documented
24  in the project area.

25

1  in the Buttermilk Late Successional Reserve (LSR).  AR 1905.[9]  The entire LSR is critical

2  habitat for the NSO.  Id.

3  Because habitat for NSO is patchy in the south part of the action area (ibid.), habitat in

4  the north is likely quite important for survival of NSO.

5  The Buttermilk LSR is the largest LSR on the Forest and is a crucial link between Yolla
   Bolly-Middle Eel Wilderness on the north, the Grizzly LSR (RC 310) to the southwest
6  and the Refuge LSR (RC 311) on the south.

7  Id.

8  In fact, the Buttermilk LSR has been "identified as the only fully functioning LSR within

9  the Forest."  AR 1896.

10  Nearly half of the treatment area would occur within the LSR, and therefore within NSO

11  critical habitat.  AR 1906.  Notably, a 6.2 mile long fuelbreak, up to 500 feet wide, would be

12  implemented under the project.  Fuelbreaks require the "removal" of habitat under FWS

13  definitions.  AR 1893, AR 48.  Note that the proposed fuelbreak would occur in parts of four

14  NSO activity centers,[10] including a significant amount of nesting/roosting and foraging habitat.

15  AR 1914.  This would degrade and/or destroy nesting/roosting and foraging habitat, and may

16  adversely affect dispersal of juveniles and habitat for "floaters" because the length of the

17  fuelbreak would make it difficult for dispersing NSO to avoid.

18  Floaters and dispersing juveniles are dependent upon unoccupied conifer stands,
   including small patches with late successional characteristics for protection from
19  predators while they wander in search of an opportunity to mate. Floaters supply a
   stabilizing influence on the population by being readily available to join a territorial
20  single bird or replace any member of a pair that dies.

21

22

23  [9] The LSR is also said to comprise 22 percent of the action area.  AR 1906.  This
   discrepancy is not explained.

24  [10] Two of these activity centers overlap.

25

1  AR 1902.

2     Dispersal is the most vulnerable life stage for NSO. Some studies have found greater than

3  70 percent mortality at this stage.  AR 2240.

4     The wide fuelbreak would also likely reduce or eliminate habitat for NSO prey.  To

5  function as a fuelbreak, this area would have to have a very low level of ground fuels and little

6  canopy cover, and thus would not be habitat for NSO's favorite prey, the dusky-footed woodrat,

7  nor for other prey such as shrews.  The project design feature requiring avoidance of wood rat

8  nests (AR 57) will not help if the area surrounding each nest is converted to non-habitat or

9  severely degraded habitat.  The 2011 Recovery Plan requires an analysis of the short-term

10  impacts to NSO prey, which was not done for the Tatham Project.

11     In short, there would be adverse impacts to NSO from implementing the approved

12  project.  These impacts must be disclosed and analyzed in an EIS.

13     Other effects discounted or not adequately analyzed include prey species.  The BA states

14  (AR 1928) activities would alter habitat for prey species within the action area.  Some dens will

15  potentially be destroyed and prey species will be temporarily displaced.  This is a direct adverse

16  effect to owls that is not analyzed.  Timeframes are not given for what is meant by "temporary."

17     The BA (AR 1979) also states limited operating periods (LOPs) can be lifted and that if

18  smoke begins to inundate N/R habitat or ACs, then steps should be taken to get the burn back to

19  prescription (which may include ceasing burning.  It also states this would require a lot of

20  discussion with the FWS.  At that point the adverse effect of smoke inundation would have

21  already occurred causing adverse effects to any owls in the area.  As discussed above, owl

22  activity centers are areas actually occupied by and used by the owl.

23     The NSO is a threatened species whose populations overall continue to decline.  It can

24  ill-afford to have its habitat continually degraded project by project.  An EIS must be prepared to

25

1  identify and analyze the potential impacts from all the projects the Forest Service has proposed,

2  approved, and implemented in the Buttermilk LSR.

3      **B.    M9 and Log Springs**

4      Defendants' own documents make clear that the cumulative impacts of the M9 and Log

5  Springs sales should have been addressed, as well as the cumulative impacts of the neighboring

6  Smokey project.  Defendants issued combined specialist reports for both the M9 and Log

7  Springs sales.   As noted above, Log Springs is actually surrounded by the M9 sale.  The two

8  sales are the same township and range and sections.  For these sales defendant USFS also simply

9  relied upon the Biological Assessment it prepared for the adjacent Smokey timber sale project,

10  which was being prepared at the same time.

11      Both projects are located 10 to 15 miles southwest of Paskenta, CA in Tehama County,

12  near the M9 Road, in T 23 N, R 8 W, sections 26-35.  The projects are on the Grindstone Ranger

13  District, Mendocino National Forest, and lie in the North Grindstone Management Area, in

14  matrix land.  For both sales, proposed treatment units are between 4000 and 5400 feet in

15  elevation.

16      In the Log Springs project, up to 70 acres would be commercially thinned, producing 300

17  thousand board feet (MBF) of green timber and 150 MBF of dead timber.  In M9, up to 250

18  acres of dead and dying trees would be salvage logged, producing 2200 MBF of green timber

19  and 660 MBF of dead material.

20      Even though the projects are in the same area, and some units in these projects are

21  directly adjacent to each other, they were approved via separate decision memos.  Defendant

22  USFS combined analyses of impacts to various resources for the two sales, including Wildlife

23  Biological Assessment (BA); Wildlife Biological Evaluation (BE); Fish BA; Invasive Species

24  Risk Assessment; Survey and Manage Report; Wildlife Management Indicator Species Report;

25

1  Hydrologic Report; Botany BA-BE; Fuels Report; and Geologic Report.

2        Both projects are near the Buttermilk Late Successional Reserve (the LSR), with three of

3  four units of the Log Springs Project immediately adjacent to the LSR and the fourth unit only a

4  short distance from the LSR.  AR 817.   About 21 percent of the action area for the projects lies

5  within the LSR.  AR 821.  Two northern spotted owl (NSO) activity centers overlap the

6  combined project area (AR 824), one of which "has a high capability of providing a viable home

7  range and of supporting a reproductive pair of owls through the nesting season (core capability)."

8  AR 827.

9        The Buttermilk LSR has been "identified as the only fully functioning LSR within the

10  Forest."  AR 1906.

11        The Forest Service believes that stands in the projects' areas "are not likely to develop

12  into suitable spotted owl habitat."  AR 824.  There is little supporting documentation for this

13  conclusion, and indeed it seems beside the point since the existence of nine "activity centers"

14  makes clear that the owls have themselves found these areas to be "suitable."  There is said to be

15  no old growth or late successional stands in M9 (AR 681) and no old growth in Log Springs (AR

16  694), but ages of stands are not given, nor is there a discussion of why it is believed that they

17  will not develop into late successional/old growth.  These actions would destroy or severely

18  degrade any NSO habitat and keep any from forming in the foreseeable future.

19        The NSO habitat in the area of the two proposed projects may not be or become the

20  highest quality habitat for this species.  About 4000 acres, or 32 percent of the action area for

21  M9 and Log Springs has previously been logged.  AR 819.  Thus any habitat that forms in the

22  M9/Log Springs area might be valuable for this species, as it would replace some habitat lost

23  from past, current, and reasonably foreseeable logging.

24        In any case, the impacts these projects could have on this existing and possible future

25

1  habitat must be analyzed in light of existing and foreseeable future projects that could affect the

2  LSR. At a minimum, the following projects in or very near the LSR are in various stages of

3  approval or implementation: Tatham Ridge Fuels Project, Smokey Project, Sugar Project, Oak

4  Ridge Habitat Enhancement, Hardin Fuels Project, Snow Basin Timber Sale, and Brewer's Fuels

5  Project. AR 774. All of them proposed various amounts of logging and/or other treatments that

6  will likely adversely affect NSO. Collectively, these projects cover at least 71 percent of the

7  LSR. Id. The cumulative impact of these projects must be analyzed.

8       With the large number of projects and acreage slated for vegetation treatment in the LSR,

9  the combined effects to NSO could easily be or become significant. If impacts may be

10 significant, an environmental impact statement (EIS) is required. See, e. g., Anderson v. Evans,

11 314 F.3d 1006 (9th Cir. 2002); Public Citizen v. Dep't of Transportation, 316 F.3d 1002 (9th Cir.

12 2003). With projects that would collectively cause a large amount of disturbance in and around

13 the Buttermilk LSR (which is also critical habitat for NSO) in various stages of approval and

14 implementation, it appears that a significant adverse impact to NSO is likely.

15      Both of the projects being appealed here have a limited operating period (LOP) for noise

16 disturbance and smoke from February 1 to July 10. See AR 664; AR 554. Other proposed

17 projects have similar LOPs.[11]

18      Some work, such as the use of mechanical equipment and the felling, bucking, and

19 skidding of trees, would cause disturbance and thus be prohibited during the LOP. This means

20 much of the work on the numerous projects could not be staggered throughout the year in order

21 to limit disturbance to NSO. Rather, any work causing disturbance or producing much smoke

22

23      [11] For example, Tatham has an LOP for nesting habitat from February 1 through
24 September 15 for nesting habitat and from February 1 to July 9 outside of nesting habitat.
   AR 59.

25

1  would have to be concentrated in the part of the year outside of the LOP, with operations likely

2  being limited or impossible during part of this time by snow. In other words, all of the above-

3  mentioned projects could operate at the same time in part of each year, causing a significant

4  disturbance to NSO over a large portion of the LSR.

5      Even during the LOP for Log Springs and M9, burning that could cause displacement of

6  NSO would be allowed:  "If heavy or concentrated smoke begins to inundate nesting/roosting

7  habitat or historic activity centers late in the afternoon, ignition <u>should</u> be discontinued."  AR

8  554; AR 664 (emph. added).  Heavy smoke could drift into activity centers, two of which

9  overlap the project area, with one of them able to support a reproductive pair of NSO.  AR 824,

10  827.  Once heavy smoke inundates nesting/roosting habitat, NSO would likely be forced out of

11  their habitat. Burning operations must be conducted so that this inundation does not occur,

12  especially during the LOP, which is when NSO will be nesting and rearing young.  At a bare

13  minimum, operations <u>must immediately cease</u> if heavy smoke inundation of nesting, roosting, or

14  foraging habitat starts to occur, and preferably well before.

15      The possible cumulative impacts of burning in the various projects proposed, approved,

16  or already being implemented in and near the LSR must be analyzed and disclosed.

17      NSO has been listed as a threatened species under the Endangered Species Act since

18  1990.  It has suffered "widespread loss and adverse modification of [its] habitat across its entire

19  range", and continues to suffer population decline.  AR 2139.  The Forest Service must take its

20  legal responsibility to protect and recover NSO seriously.  It must analyze possible cumulative

21  impacts from all past, present, and reasonably foreseeable projects that could affect this species,

22  <u>prior</u> to implementing any of these projects.  It will then need to consult with the Fish and

23  Wildlife Service concerning effects to NSO and its critical habitat.

24  **IV.    DEFENDANT'S FAILURE TO PREPARE A FULL ENVIRONMENTAL IMPACT**

25

**STATEMENT VIOLATES NEPA**

As noted above, defendant USFS prepared neither an EA nor an EIS for the three projects.

NEPA requires a full Environmental Impact Statement (EIS) as opposed to an Environmental Assessment (EA) if the project "may significantly impact the environment." Anderson, 314 F.3d 1006; Public Citizen, 316 F.3d 1002.

One of the factors that must be considered when whether a project may significantly impact the environment is "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. 1508.27(b)(9).

The three projects, alone and in conjunction with each other and with the other projects within the LSR/CHU, may significantly impact the environment.

NSO surveys are not up to date. The Tatham BA describes surveys done for NSO in "owl home ranges that may be affected by the project." AR 1909. Notably, there have been no recent surveys in these areas (the nine activity centers), the latest for any such areas being 2006. AR 1909-10.[12] As discussed *supra,* the 2011 Survey Protocol requiring three visits to each owl site in order to better detect spotted owls and barred owls, has not been done and therefore the best available scientific protocol has not been used.[13]

_____

[12] This is the case even though there have apparently been NSO surveys as late as 2011 on other parts of the National Forest. See AR 1909.

[13] Defendants have stated that instead of doing the surveys they assumed owls occupied the area – i.e. a "worst case" scenario. Exhibit B at 7. However, to be meaningful, that requires the Forest Service to also assume that the activity centers in which it proposes logging are occupied – which the agency has not done.

Failure to survey for NSO, especially before approving a project in an LSR and critical habitat, violates the following Forest Plan directions:

> "Conduct necessary inventory and monitoring activities to determine population densities and habitat trends within each area." – AR 1617 (Forest Plan at IV-44).

> "Conduct necessary inventory and monitoring activities within each LSR to determine population densities and habitat trends for wildlife species dependent on older mature forested habitats." – AR 1628 (Forest Plan at IV-67).

Without accurate, up-to-date information of NSO populations and trend in the activity centers, the Forest Service cannot determine that the Tatham Project, M9, and Log Springs timber sales will not be likely to adversely affect the species or its critical habitat.

**CONCLUSION**

Defendant USFS's decisions regarding the Tatham, M9, and Log Springs projects are not in accordance with law, were made without observance of procedures required by law, and are arbitrary and capricious within the meaning of the APA. Based upon this brief, the administrative record, and the declarations submitted to the court, plaintiff respectfully requests that the Court declare that the defendants violated the National Environmental Policy Act and the Administrative Procedure Act, and their implementing regulations, in approving the three projects; declare that the Decision Memo for the three projects are insufficient as a matter of law; enjoin defendant USFS from undertaking any activities related to the three projects, unless and until it has complied with NEPA and the APA; grant plaintiff such additional relief as the Court deems just and equitable.

DATED March 7, 2013.

   /s/ James Jay Tutchton
James Jay Tutchton (CA State Bar # 150908)
Tutchton Law Office
6439 E. Maplewood Ave.
Centennial, CO 80111

(720) 301-3843
E-mail: jtutchtonlo@gmail.com

  /s/  Marianne Dugan
Marianne Dugan, *pro hac vice* (OR State Bar # 932563)
259 E. 5th Ave. Ste 200-D
Eugene, OR  97401
(541) 338-7072
Fax (866) 650-5213
mdugan@mdugan.com