1

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT

8                     EASTERN DISTRICT OF CALIFORNIA

9                          ----oo0oo----

10

11   CONSERVATION CONGRESS          NO. CIV. 2:12-02416 WBS KJN

12          Plaintiff,
                                    MEMORANDUM AND ORDER RE:
13       v.                         MOTIONS FOR SUMMARY JUDGMENT

14   UNITED STATES FORREST SERVICE
     and UNITED STATES FISH AND
15   WILDLIFE SERVICE,

16          Defendants.
     _____/
17

18

19                          ----oo0oo----

20          Plaintiff Conservation Congress brought this action

21   against defendants United States Forest Service ("USFS") and

22   United States Fish and Wildlife Service ("FWS") challenging

23   defendants' actions in connection with three proposed vegetation

24   clearance projects on the Mendocino National Forest.  Presently

25   before the court are the parties' cross-motions for summary

26   judgment under Federal Rule of Civil Procedure 56 and plaintiff's

27   motion to defer consideration of its Endangered Species Act

28   ("ESA") claims under Federal Rule of Civil Procedure 56(d).

                                1

I.   Relevant Facts and Procedural History

In 2012, USFS authorized three projects to take place on the Grindstone Ranger District of the Mendocino National Forest, a unit of national forest managed by USFS. (Administrative Record ("AR") at 45, 528, 655 (Docket Nos. 20, 35).)  The Mendocino National Forest is home to the Northern Spotted Owl ("NSO"), a species listed as threatened under the ESA.  (Id. at 337.)  The Mendocino National Forest also contains the Buttermilk Late Successional Reserve ("Buttermilk LSR"). (Id. at 355, 1477.)[1]  The Buttermilk LSR "is the largest LSR on the forest and a crucial link" between various other LSRs in the region.  (Id. at 355.)

When initially planning the projects, "all of the Buttermilk LSR [was] designated spotted owl critical habitat" under the 2008 rule for NSO critical habitat, see Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the N. Spotted Owl, 73 Fed. Reg. 47,326 (Aug. 13, 2008).  (AR at 355)  In December 2012, a new rule designating NSO critical habitat was published to become effective January 3, 2013.  See Endangered and Threatened Wildlife and Plants; Designation of Revised Critical Habitat for the N. Spotted Owl,

_____

[1]    LSRs are managed to protect and enhance late successional forest habitat for species dependent upon its attributes, and to help ensure the conservation of species diversity. (AR at 1675.)  The main role of LSRs is to protect from large scale disturbances such as stand replacing fire, windthrow, insect and disease epidemics, and major human caused impacts.  (Id.)  As recognized by the Ninth Circuit, "LSRs lie at the heart of the [National Forest Plan's] ecosystem-based conservation strategy for the northern spotted owl and other endangered species."  Or. Nat. Res. Council v. Brong, 492 F.3d 1120, 1126 (9th Cir. 2007).

2

77 Fed. Reg. 71,876 (Dec. 4, 2012).  The 2012 rule affected the NSO critical habitat designation of several areas of the Mendocino National Forest.  (AR at 2542.)[2]

A.  Tatham Ridge Fuels Project

The first project, called the Tatham Ridge Fuels Project ("Tatham Project"), was authorized by a decision memo issued on May 25, 2012.  (Id. at 45-53.)  The Tatham Project was designed to reduce wildfire hazard, to accelerate tree growth for sustained timber productivity, and to develop late-successional habitat in accordance with the Buttermilk LSR.  (See id. at 106, 367, 415-16, 2141.)

The Tatham Project involves three types of treatments: (1) 1,300 acres of plantation thinning by removing small trees to allow larger trees to grow more quickly; (2) approximately 879 acres of fuel break construction; and (3) 1,800 acres of prescribed burning of the understory to reduce fuel loading of forests.  (Id. at 46, 343-45.)  USFS created a biological assessment ("BA") for the Tatham Project.  (Id. at 334).  At the time of the BA, twenty-six percent of the total action area[3] proposed by the Tatham Project would occur within the Buttermilk LSR.  (Id. at 355.)  Approximately fifty-four percent of the action area provides suitable NSO nesting/roosting, foraging, or

---

[2]    USFS maintains that "[b]ecause of this new designation, [t]he Buttermilk LSR is no longer coterminous with a critical habitat unit."  (Defs.' Cross-Mot. at 8 n.16 (Docket No. 39-1).)

[3]    USFS documents distinguish between the "project area" and the "action area."  "[P]roject areas only encompass the actual units proposed for treatment," while "action areas" "include the proposed treatment units plus a 1.3 mile radius surrounding the unit boundaries."  (AR at 809 (emphasis added).)

dispersal habitat.  (Id.)  USFS concluded that the Tatham
Project, "'May Affect, but is Not Likely to Adversely Affect' the
northern spotted owl."  (Id. at 383.)

The Tatham Project was determined to qualify for
Categorical Exclusion Six ("CE 6"), 36 C.F.R. § 220.6(e)(6),
involving timber stand and/or wildlife habitat improvement
activities which do not include the use of herbicides.  (AR at
48-51.)  Thus, while USFS created a BA and decision memo, it did
not create an environmental assessment ("EA") or environmental
impact statement ("EIS") in connection with the project.

B.   Log Springs Project

USFS authorized the Log Springs Project by issuing a
decision memo on June 28, 2012.  (Id. at 658.)  The Log Springs
Project proposes the thinning of fifty to seventy year old
ponderosa pine over seventy acres to increase resiliency to
western bark beatles and to reduce high fuel loads, as well as to
meet the timber production quotas for the Mendocino National
Forest.  (Id. at 655-57, 695-97.)  In a joint BA prepared for
both the Log Springs and M9 Sanitation Salvage Project ("M9
Project"), USFS determined that the Log Springs Project does not
contain any designated NSO habitat or activity centers.  (Id. at
823-33.)  None of the project area occurs within the Buttermilk
LSR, but twenty-one percent of the action area overlaps with the
LSR.  (Id. at 821-22.)  USFS determined that both the Log Springs
and M9 Projects "'Would Not Affect' the northern spotted owl or
its Critical Habitat."  (Id. at 831.)

USFS determined that the Log Springs Project qualified
for Categorical Exclusion Twelve ("CE 12"), 36 C.F.R. §

4

1  220.6(e)(12), involving the timber harvest of seventy acres or

2  less. (Id. at 658.)  USFS did not create an EA or EIS for the

3  project.

4          C.   M9 Sanitation Salvage Project

5          The M9 Project was authorized by USFS through a

6  decision memo issued on June 28, 2012. (Id. at 531.)  The M9

7  Project proposes salvage and sanitation harvest of dead, dying,

8  and at-risk trees on 250 acres, followed by reforestation "to

9  timely restore productivity to desired levels." (Id. at 528-31,

10 573-75.)  The project area exhibits larger than normal pockets of

11 mortality due to bark beetle infestation which contributes to

12 heavy fuel loads. (Id. at 528, 530, 571-72.)  The M9 Project is

13 designed to address past beetle attacks, reduce fuel load on the

14 forest, and contribute to the Mendocino National Forest's annual

15 timber harvest levels. (Id. at 529-30.)  As with the Log Springs

16 Project, none of the project area occurs within the Buttermilk

17 LSR, but twenty-one percent of the action area overlaps with the

18 LSR. (Id. at 821-22).  No designated NSO habitat or activity

19 centers are present within the M9 Project area. (Id. at 823-33.)

20 The joint BA found that the M9 and Log Springs Projects "'Would

21 Not Affect' the northern spotted owl or its Critical Habitat."

22 (Id. at 831.)

23          USFS determined that the M9 Project fit within

24 Categorical Exception Thirteen for the salvage harvest of 250

25 acres or less of dead or dying trees ("CE 13"), 36 C.F.R. §

26 220.6(e)(13), Categorical Exception Fourteen for sanitation

27 harvest to control insects or disease ("CE 14"), id. §

28 220.6(e)(14), and Categorical Exclusion Five for the regeneration

1  of native species ("CE 5"), id. § 220.6(e)(5).  (AR at 527, 531.)

2  USFS did not create an EA or EIS in connection with the project.

3      D.   Procedural History

4          Plaintiff is a non-profit organization dedicated to

5  maintaining, protecting, and restoring the native ecosystems of

6  northern California.  (Compl. ¶ 18 (Docket No. 1).)  Plaintiff

7  filed suit challenging defendants' actions in connection with the

8  approval of the three projects, bringing claims under both the

9  National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et

10  seq., and the ESA, 16 U.S.C. § 1531 et seq.  Plaintiff's NEPA

11  claims are brought exclusively against USFS and include: (1)

12  improper use of a categorical exclusion; (2) failure to analyze

13  cumulative impacts of the three projects; and (3) failure to

14  prepare an EIS.  (Id. ¶¶ 122-152.)  Plaintiff also brings various

15  ESA claims, the majority of which are brought against both USFS

16  and FWS.  (Id. ¶¶ 153-196.)

17          On December 21, 2012, defendants moved to limit the

18  court's review to the administrative record and deny discovery by

19  plaintiff.  (Docket No. 17.)  The court denied the motion without

20  prejudice to the right to object subsequently to the

21  consideration of material outside of the record.  (Feb. 26, 2013

22  Order at 2 (Docket No. 29).)  The court ordered that "[p]laintiff

23  may pursue discovery regarding its ESA claims against USFS while

24  plaintiff litigates its summary judgment motion on its claims

25  under [NEPA]."  (Id.)

26          Plaintiff moved for summary judgment on its NEPA claims

27  under Rule 56.  (Docket No. 30.)  Defendants, in their cross-

28  motion for summary judgment, moved for summary judgment on both

6

1   the NEPA and ESA claims.  (Docket No. 39.)  Plaintiff moved to

2   defer consideration of the ESA claims under Rule 56(d).  (Docket

3   No. 41.)

4   II.  <u>Motion to Defer</u>

5        Rule 56(d) provides that "[i]f a nonmovant shows by

6   affidavit or declaration that, for specified reasons, it cannot

7   present facts essential to justify its opposition, the court may

8   . . . defer considering the motion or deny it."  Fed. R. Civ. P.

9   56(d).  "To prevail under . . . Rule [56(d)], [a] part[y]

10  opposing a motion for summary judgment must make (a) a timely

11  application which (b) specifically identifies (c) relevant

12  information, (d) where there is some basis for believing that the

13  information sought actually exists."  <u>Emp'rs Teamsters Local Nos.</u>

14  <u>175 & 505 Pension Trust Fund v. Clorox Co.</u>, 353 F.3d 1125, 1129

15  (9th Cir. 2004) (internal quotation marks and citation omitted).

16       Here, plaintiff notes that the deposition of its ESA

17  expert has yet to occur, and documents regarding the defendants'

18  continued consultation regarding the Tatham Project were produced

19  during the briefing of the cross-motions for summary judgment.

20  (Docket No. 36.)  The court finds plaintiff's application

21  sufficient to defer consideration of its ESA claims under Rule

22  56(d), and plaintiff's motion will accordingly be granted.

23       The court now turns to the parties' cross motions for

24  summary judgment on plaintiff's NEPA claims.

25  III. <u>Cross-Motions for Summary Judgment</u>

26       The court reviews NEPA claims to determine whether they

27  are "arbitrary, capricious, an abuse of discretion, or otherwise

28  not in accordance with law" under the Administrative Procedure

1  Act ("APA").  5 U.S.C. § 706(2)(A); see Ctr. for Biological

2  Diversity v. Salazar, 706 F.3d 1085, 1090 (9th Cir. 2013).

3  "Agency action is arbitrary and capricious if 'the agency has

4  relied on factors which Congress has not intended it to consider,

5  entirely failed to consider an important aspect of the problem,

6  offered an explanation for its decision that runs counter to the

7  evidence before the agency, or is so implausible that it could

8  not be ascribed to a difference in view or the product of agency

9  expertise.'"  Great Old Broads for Wilderness v. Kimbell, 709

10 F.3d 836, 846 (9th Cir. 2013) (quoting City of Sausalito v.

11 O'Neill, 386 F.3d 1186, 1206 (9th Cir. 2004)).

12      "A reviewing court 'generally must be at its most

13 deferential when reviewing scientific judgment and technical

14 analyses within the agency's expertise."  Id. (internal quotation

15 marks and citation omitted).  The court also "defers to [the

16 agency's] 'interpretation of its own regulations . . . unless

17 plainly erroneous or inconsistent with the regulations being

18 interpreted.'"  Salazar, 706 F.3d at 1090 (alteration in

19 original) (quoting Long Island Care at Home, Ltd. v. Coke, 551

20 U.S. 158, 171 (2007)).  "As the Supreme Court stated in Citizens

21 to Preserve Overton Park, Inc. v. Volpe, 'the ultimate standard

22 of review is a narrow one,' and '[t]he court is not empowered to

23 substitute its judgment for that of the agency.'"  Klamath-

24 Siskiyou Wildlands Cntr. v. Bur. of Land Mgmt., 387 F.3d 989, 993

25 (9th Cir. 2004) (quoting Citizens to Preserve Overton Park, Inc.

26 v. Volpe, 401 U.S. 402, 416 (1971)).

27     A.   Standing

28          "In limiting the judicial power to 'Cases' and

8

'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violations of law." Summers v. Earth Island Inst., 555 U.S. 488, 492 (2009).  "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the alleged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." Id. (citing Friends of the Earth, Inc. v. Laildlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).

         "'It is common ground that . . . [an] organization[] can assert the standing of its members.'  But the organization asserting standing must provide 'specific allegations establishing that at least one identified member [has] suffered or would suffer harm . . . .'"  W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 483 (9th Cir. 2010) (first five alterations in original) (quoting Summers, 555 U.S. at 494, 498). "While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the aesthetic interests of the plaintiff, that will suffice."  Summers, 555 U.S. at 494 (citing Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972)).

         In support of its motion, plaintiff submits the declaration of Denise Boggs, Executive Director and member of plaintiff's organization.  (Docket Nos. 30-1, 30-2.)  Ms. Boggs

declares that she regularly visits the Mendocino National Forest
where the proposed projects will take place, (Boggs Decl. ¶¶ 2, 7
(Docket No. 30-1)), that she has plans to return in August 2013,
(id. ¶ 7), and that she is interested in the wildlife and
vegetation, particularly raptors and "beautiful large old trees
and snags," (id.).  The proposed projects, and the Tatham Project
in particular, allegedly threaten to injure these interests.
(Id.)  The court finds that Ms. Boggs' declaration is sufficient
to demonstrate plaintiff's standing.  See Kraayenbrink, 632 F.3d
at 484-85 (declaration of Western Watersheds Project's founder
identifying grazing allotment site that "he has personally
visited and continues to visit, study, enjoy, and in which he
pursues recreational activities," the regulation of which would
allegedly damage his aesthetic enjoyment, was sufficient to
satisfy standing).

   B.   Waiver and Exhaustion of Administrative Remedies

        "Persons challenging an agency's compliance with NEPA
'must structure their participation so that it . . . alerts the
agency to the [parties'] position and contentions,' in order to
allow the agency to give the issue meaningful consideration."
Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1132 (9th Cir.
2011) (alterations in original) (quoting Dep't of Transp. v.
Public Citizen, 541 U.S. 752, 764 (2004)).  While an issue not
raised during the notice and comment may result in waiver of that
argument in federal court, see N. Idaho Cmty. Action Network v.
U.S. Dep't of Transp., 545 F.3d 1147, 1156 n.2 (9th Cir. 2008),
"a party has participated in a sufficiently meaningful way when
it has alerted the agency to its position and claims," City of

1  Sausalito, 386 F.3d at 1208.

2        "The exhaustion doctrine serves 'to permit

3  administrative agencies to utilize their expertise, correct any

4  mistakes, and avoid unnecessary judicial intervention in the

5  process.'" Kimbell, 709 F.3d at 846 (quoting Lands Council v.

6  McNair, 629 F.3d 1070, 1076 (9th Cir. 2010)).  "The APA requires

7  that plaintiffs exhaust available administrative remedies before

8  bringing grievances to federal court, 5 U.S.C. § 704," including

9  the specific appeal procedures established by the agency.

10 Kimbell, 709 F.3d at 846.  The Ninth Circuit has "defined the

11 exhaustion requirement broadly: 'The plaintiffs have exhausted

12 their administrative appeals if the appeal, taken as a whole,

13 provided sufficient notice to the [agency] to afford it the

14 opportunity to rectify the violations that plaintiffs alleged."

15 Great Basin Mine Watch v. Hankins, 456 F.3d 955, 965 (9th Cir.

16 2006) (alteration in original) (quoting Native Ecosystems Council

17 v. Dombeck, 304 F.3d 886, 899 (9th Cir. 2002)).  Plaintiffs are

18 not barred from bringing claims when the plaintiffs "'presented a

19 much less refined legal argument in their administrative

20 appeal.'"  Id. (quoting Native Ecosystems, 304 F.3d at 898).

21       USFS argues that plaintiff waived and failed to exhaust

22 its arguments regarding the Log Springs Project because

23 plaintiff's comments were submitted five days late, (Defs.'

24 Cross-Mot. at 20 (Docket No. 39)), while plaintiff argues that,

25 due to a publishing error regarding the related M9 Project, the

26 notice and comment date was delayed such that its joint comments

27 on the Log Springs and M9 Projects were timely, (Pl.'s Reply at

28 8-9 (Docket No. 42)).  It appears to the court that plaintiff, at

11

1  the very least, participated in a way that sufficiently alerted

2  USFS to its position and claims regarding the Log Springs

3  Project, see Barnes, 655 F.3d at 1132, especially when the two

4  projects shared many of the same expert reports, were originally

5  published on the same day, and were close geographically.  Since

6  USFS does not dispute that it was put on notice of plaintiff's

7  claims and arguments regarding the project, the court will

8  consider those arguments.

9        USFS also asserts that plaintiff's comments and

10  administrative appeal did not raise the argument that the size of

11  the Tatham Project precludes the use of a categorical exclusion,

12  and therefore this argument is waived and barred.  In its

13  comments and administrative appeal, plaintiff argued generally

14  that use of a categorical exclusion was inappropriate for the

15  Tatham Project.  (AR at 467-68, 18-20.)  Since "[t]he court of

16  appeals . . . has declined to require more than general

17  objections during the administrative process to avoid 'unduly

18  burden[ing] those who pursue administrative appeals unrepresented

19  by counsel who may frame their claims in non-legal terms rather

20  than precise legal forumlations,'" the court will consider

21  plaintiff's arguments regarding the size of the Tatham Project.

22  Save Strawberry Canyon v. U.S. Dep't of Energy, 830 F. Supp. 2d

23  737, 746 (N.D. Cal. 2011) (holding that raising only general

24  concerns about noise, and not specifically criticizing the manner

25  in which noise was calculated, was sufficient for the district

26  court to consider the argument).

27        C.   Improper Use of Categorical Exclusions

28             "NEPA requires that federal agencies perform

12

environmental analysis before taking any 'major Federal actions

significantly affecting the quality of the human environment.'"

Salazar, 706 F.3d at 1094 (quoting 42 U.S.C. § 4332(2)(c)).

"NEPA does not require particular environmental standards or

mandate that agencies achieve substantive environmental results."

Greater Yellowstone Coal. v. Lewis, 628 F.3d 1143, 1150 (9th Cir.

2010).  Congress in enacting NEPA "required only that the agency

take a 'hard look' at the environmental consequences before

taking a major action."  Baltimore Gas & Elec. Co. v. Natural

Res. Def. Council, Inc., 462 U.S. 87, 97 (1983).

        "Under the CEQ regulations, which were promulgated

pursuant to NEPA, each agency is directed to identify

'categorical exclusions' which are categories of actions which do

not, individually or cumulatively, have a significant effect on

the human environment and therefore, do not require an EA or

EIS."  Alaska Ctr. For Env't v. U.S. Forest Serv., 189 F.3d 851,

857 (9th Cir. 1999) (citing 40 C.F.R. § 1508.4).  Federal

agencies are also required to "provide for extraordinary

circumstances," which are circumstances "in which a normally

excluded action may have a significant environmental impact."  40

C.F.R. § 1508.4.  "When extraordinary circumstances are present,

the agency must prepare environmental documentation despite the

fact that the activity in question falls within a categorical

exclusion."  California v. Norton, 311 F.3d 1162, 1170 (9th Cir.

2002).

        To comply with NEPA when evaluating a particular

project for categorical exclusion, an agency must first determine

whether the proposed action falls within a categorical exclusion

1   and then determine whether "extraordinary circumstances" exist

2   that would prevent application of the exclusion.  See id.;

3   Salazar, 706 F.3d at 1097.  "Application of a categorical

4   exclusion is not an exemption from NEPA; rather, it is a form of

5   NEPA compliance, albeit one that requires less than where an

6   environmental impact statement or an environmental impact is

7   necessary."  Salazar, 706 F.3d at 1096 (citing 40 C.F.R. §

8   15084.4).  "[W]here a proposed action fits within a categorical

9   exclusion, full NEPA analysis is not required."  Id. at 1097

10  (citing Wong v. Bush, 542 F.3d 732, 737 (9th Cir. 2008)).

11          Consistent with CEQ regulations, USFS has promulgated

12  seventeen categorical exceptions which require a project or case

13  file and decision memo to satisfy NEPA.  See 36 C.F.R. §

14  220.6(e).  In providing for "extraordinary circumstances"

15  sufficient to preclude use of its categorical exclusions, USFS

16  has determined that:

17      Resource considerations that should be considered in
        determining whether extraordinary circumstances related
18      to a proposed action warrant further analysis and
        documentation in an EA or an EIS are:
19
        (i) Federally listed threatened or endangered species or
20      designated critical habitat, species proposed for Federal
        listing or proposed critical habitat, or Forest Service
21      sensitive species;

22      (ii) Flood plains, wetlands, or municipal watersheds;

23      (iii) Congressionally designated areas, such as
        wilderness, wilderness study areas, or national
24      recreation areas;

25      (iv) Inventoried roadless area or potential wilderness
        area;
26
        (v) Research natural areas;
27
        (vi) American Indians and Alaska Native religious or
28      cultural sites; and

14

1       (vii) Archaeological sites, or historic properties or
2       areas.

3   36 C.F.R. § 220.6(b)(1).

4           "The mere presence of one or more of these resource
5   conditions does not preclude use of a categorical exclusion . . .
6   ." Id. § 220.6(b)(2).  "It is the existence of a cause-effect
7   relationship between a proposed action and the potential effect
8   on these resource conditions, and if such a relationship exists,
9   the degree of the potential effect of a proposed action on these
10  resource conditions that determines whether extraordinary
11  circumstances exist." Id.

12          1.   Tatham Project

13          The USFS determined that the Tatham Project fit within
14  CE 6.  (AR at 48-51.)  CE 6 is an exclusion for "[t]imber stand
15  and/or wildlife improvement activities that do not include the
16  use of herbicides or do not require more than 1 mile of low
17  standard road construction."  36 C.F.R. § 220.6(e)(6).  Examples
18  include, but are not limited to:

19      (i) Girdling trees to create snags;

20      (ii) Thinning or brush control to improve growth or to
21      reduce fire hazard including the opening of an existing
        road to a dense timber stand;

22      (iii) Prescribed burning to control understory hardwoods
23      in stands of southern pine; and

24      (iv) Prescribed burning to reduce natural fuel build-up
        and improve plant vigor.

25  Id.  If a proposed project fits within this exclusion and no
26  extraordinary circumstances exist, USFS need only create a
27  project or case file and decision memo.  Id. § 220.6(e).
28  Plaintiff does not contest that the Tatham Project's plantation

15

1  thinning, fuel break construction, and prescribed burning are

2  activities that fit within CE 6.

3      Keeping in mind that an extraordinary circumstance is a

4  circumstance "in which a normally excluded action _may_ have a

5  significant environmental impact," 40 C.F.R. § 1508.4 (emphasis

6  added), USFS's determination that no extraordinary circumstances

7  existed to preclude the use of a categorical exclusion does not

8  appear to be supported by the record.  A significant portion of

9  the Tatham Project occurs in NSO nesting/roosting or foraging

10  habitat, (AR at 363), short-term effects of thinning include "a

11  possible loss of suitable spotted owl habitat," (_id._ at 367), and

12  "[a]ll treatments have the potential to directly affect nesting,

13  foraging or dispersing individuals due to disturbance, noise or

14  smoke, which could possibly disrupt reproductive behavior and/or

15  cause nest failure," (_id._ at 371).  The BA prepared in support of

16  the Tatham Project admits that the Project "May Affect, but is

17  Not Likely to Adversely Affect the northern spotted owl."  (_Id._

18  at 383 (internal quotation marks omitted).)

19      Similarly to _California v. Norton_, 311 F.3d 1162, (9th

20  Cir. 2002), "there is substantial evidence in the record that

21  exceptions to the categorical exclusion _may_ apply, and the fact

22  that the exceptions may apply is all that is required to prohibit

23  use of the categorical exclusion."  _Norton_, 311 F.3d at 1177.[4]

24

25      [4]   _Norton_ also states that "[w]here there is substantial
    evidence in the record that exceptions to the categorical
26  exclusion may apply, the agency must at the very least explain
    why the action does not fall within one of the exceptions."
27  _Norton_, 311 F.3d at 1177.  Phrased another way, an agency's
    explanation as to why a categorical exclusion applies is a
28  necessary, but not sufficient, condition to correctly apply a
    categorical exclusion.  While USFS included discussion in the

1   The court also notes that, while the USFS Handbook "does not have
2   the independent force and effect of law," see Southwest Center
3   for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443,
4   1450 (9th Cir. 1996), the Handbook provides that "[i]f the degree
5   of potential effect raises uncertainty over its significance,
6   then an extraordinary circumstance exists, precluding use of a
7   categorical exception."  U.S. Forest Serv. Handbook 1909.15, ch.
8   30, § 31.2 (2010); see Alaska Ctr., 189 F.3d 858 (citing the USFS
9   Handbook in its analysis of categorical exclusions).

10           One of the primary cases relied upon by USFS, Southwest
11  Center for Biological Diversity v. United States Forest Service,
12  100 F.3d 1443 (9th Cir. 1996), noted that "an agency may issue a
13  categorical exclusion even where threatened or endangered species
14  are present if the agency determines that the project will not
15  impact negatively on the species."  Sw. Ctr., 100 F.3d at 1449
16  (emphasis added) (citing Pyramid Lake Paiute Tribe v. U.S. Dep't
17  of the Navy, 898 F.2d 1410, 1414-16, 1420 (9th Cir. 1990)).
18  Here, the agency did not determine that the project will not
19  affect the NSO; rather, it concluded that the project is not
20  likely to adversely affect the NSO.  In Southwest Center, the
21  defendant agency in that case made a "no effect" finding
22  regarding the species at issue--similarly to the M9 and Log
23  Springs Projects here--whereas the Tatham Project involved a
24  finding that the Project may affect, but is not likely to
25  adversely affect, the NSO.  See id. at 1449-50.

26

27  _____
28  Decision Memo explaining its decision, the court finds that
    USFS's explanation was not sufficient to establish that
    extraordinary circumstances were not present.

17

1    Since the court finds that USFS's decision to apply a

2  categorical exclusion to the Tatham Project is arbitrary and

3  capricious, plaintiff's motion for summary judgment on the Tatham

4  Project be granted and USFS's motion for summary judgment will be

5  denied.  USFS must therefore prepare legally adequate NEPA

6  documentation for the Tatham Project.

7         2.  Log Springs Project

8    As for the Log Springs Project, USFS determined that it

9  fit within CE 12, which provides for the exclusion of

10         [h]arvest of live trees not to exceed 70 acres, requiring
           no more than 1/2 mile of temporary road construction. .
11         . . Examples include, but are not limited to: (i) removal
           of individual trees for sawlogs, speciality products, or
12         fuelwood, and (ii) Commercial thinning of overstocked
           stands to achieve the desired stocking level to increase
13         health and vigor.

14  36 C.F.R. § 220.6(e)(12).

15    The Log Springs Decision Memo notes that project area

16  is "currently over stocked for ponderosa pine stands; this has

17  been shown to make the stands vulnerable to western bark beetle

18  attacks."  (AR at 655.)  In addition, the Memo notes that the

19  over stocking has created high fuel loads "which are above levels

20  which would allow for beneficial effects from fire."  (Id. at

21  656.)  These determinations are supported by the Log Springs

22  Project Silviculture Report.  (Id. at 694-95.)

23    The BA created in connection with the Log Springs and

24  M9 Projects notes that some NSO activity centers overlap the

25  action area of the projects, but after analyzing both the direct

26  and indirect effects on the NSO, USFS determined that the

27  projects "Would Not Affect" the NSO.  The BA found that no NSO

28  nesting, roosting, or foraging habitat will be treated, the

1 projects are outside the NSO critical habitat, any proposed

2 treatments are not within a quarter mile of any suitable NSO

3 nesting habitat so disturbance would not occur, and "[although]

4 some prey species may be temporarily displaced, the distance to

5 spotted owl foraging habitat is such that spotted owl foraging

6 success would not be affected." (Id. at 831.)  After the 2012

7 critical habitat rule was passed, USFS again determined that the

8 Log Springs Project would not adversely affect the NSO because

9 its project areas were not within newly designated critical

10 habitat.  (Id. at 2574.)

11       From the record before the court, USFS's decisions that

12 the Log Springs Project qualifies for categorical exclusion under

13 CE 12 and that no extraordinary circumstances exist were not

14 arbitrary or capricious.  The court will accordingly deny

15 plaintiff's motion for summary judgment in its favor while

16 granting USFS's motion for summary judgment against plaintiff on

17 this claim.

18            3.  M9 Project

19       USFS determined that the M9 project fit within CE 13,

20 CE 14, and CE 5.  (AR at 531-33.)  To be excluded under CE 13,

21 the project must involve "[s]alvage of dead and/or dying trees

22 not to exceed 250 acres, requiring no more than 1/2 mile of

23 temporary road construction. . . . Examples include, but are not

24 limited to "(i) [h]arvest of a portion of a stand damaged by a

25 wind or ice event and construction of a short temporary road to

26 access the damaged trees, and (ii) [h]arvest of fire-damaged

27 tree."  36 C.F.R. § 220.6(e)(13).

28       CE 14 involves "[c]ommercial and non-commercial

19

1  sanitation harvest to control insects or disease not to exceed
2  250 acres, requiring no more than 1/2 mile of temporary road
3  construction, including removal of infested/infected trees and
4  adjacent live uninfested/uninfected trees as determined necessary
5  to control the spread of insects or disease."  36 C.F.R. §
6  220.6(e)(14).  "Examples include, but are not limited to: (i)
7  Felling and harvest of trees infested with southern pine beetles
8  and immediately adjacent uninfested trees to control expanding
9  spot infestations, and (ii) Removal and/or destruction of trees
10 affected by a new exotic insect or disease . . . ."  Id.

11      CE 5 allows for the exclusion of "[r]egeneration of an
12 area to native tree species, including site preparation that does
13 not involve the use of herbicides or vegetation type conversion."
14 36 C.F.R. § 220.6(e)(5).  "Examples include, but are not limited
15 to: . . . (ii) Planting trees or mechanical seed dispersal of
16 native tree species following a fire, flood, or landside."  Id.

17      USFS's determination that the M9 Project fit within
18 these three CEs is not arbitrary or capricious.  The M9 Project
19 includes commercial thinning of 250 acres of ponderosa pine to
20 limit mortality caused by western bark beetle attacks, (AR at
21 528-29, 571-72), an activity which plausibly fits within CE 14,
22 see 36 C.F.R. § 220.6(e)(14).  USFS's determination that the M9
23 Project also fit within CE 13, which involves the salvage of dead
24 and dying trees is also not implausible, as just under a quarter
25 of all board feet of timber products harvested in the Project
26 would involve dead timber products, (AR at 529), and one of the
27 primary purposes of the project was to "recover the economic
28 value of salvageable dead trees," (id. at 570).  Finally, the M9

1   Project proposes reforestation for under stocked areas to restore

2   productivity to timber producing areas, (id. at 529), which

3   plausibly conforms with CE 5, see 36 C.F.R. § 200.6(e)(5).

4          As noted above, USFS adequately considered the impacts

5   on the NSO and was not arbitrary and capricious in finding that

6   no extraordinary circumstances existed to preclude application of

7   a categorical exclusion.  (See AR 831.)  Accordingly, the court

8   will deny plaintiff's motion for summary judgment and will grant

9   summary judgment in favor of USFS on this claim.

10         D.   Cumulative Impacts

11         In addition to challenging the projects independently,

12  plaintiff alleges that USFS failed to consider "cumulative

13  impacts" of the combined Log Springs and M9 Projects, as well as

14  the projects' effects in combination with other regional

15  projects, such as nearby Smokey Project.  (Compl. ¶¶ 141-45;

16  Pl.'s Mot. at 32-35; Pl.'s Reply at 17-19.)  In Center for

17  Biological Diversity v. Salazar, the Ninth Circuit analyzed this

18  very issue in connection with the Bureau of Land Management's

19  application of a categorical exclusion to the issuance of a

20  gravel extraction permit.  Salazar, 706 F.3d at 1096.  The court

21  explained that the language of 40 C.F.R. § 1508.25, which

22  requires that an agency consider "indirect" and "cumulative"

23  impacts, "explicitly applies to environmental impacts

24  statements," and "application of [its] requirements to

25  categorical exclusions is inconsistent with the efficiencies that

26  the abbreviated categorical exclusion process provides."  Id. at

27  1097.  Noting that "where a proposed action fits within a

28  categorical exclusion, full NEPA analysis is not required," the

court concluded that § 1508.25's requirements "do not apply to
[the agency's] categorical exclusion analysis in this case."
Id.[5]

       While the Salazar court engaged in a cumulative effects
analysis, it did so because BLM's regulations required a finding
of extraordinary circumstances when a proposed action would
"'[h]ave a direct relationship to other actions with individually
insignificant but cumulatively significant environmental
effects.'"  See id. at 1097 (alteration in original) (citing BLM
NEPA Handbook App'x at 5, § 2.6; 43 C.F.R. § 46215(f)) ("Though
not required to do so by section 1508.25, under BLM's own
regulations, this 'extraordinary circumstances' analysis required
BLM to consider whether issuance of the gravel permit would
'[h]ave a direct relationship to other actions with individually
insignificant but cumulative significant environmental effects.'"
(emphasis added)).  Here, however, the Forest Service's
regulations do not require a cumulative impacts analysis when
determining whether there are extraordinary circumstances, and
plaintiff points to no applicable regulation requiring any such
analysis.  See 36 C.F.R. § 220.6(b); Forest Serv. NEPA Handbook §
31.2.  In the absence of a clear requirement that the USFS
consider cumulative impacts in its categorical exclusion
analysis, the court declines to require consideration of
cumulative impacts.

_____

       [5]   Salazar specifically declined to apply Kern v. U.S.
Bur. of Land Mgmt., 284 F.3d 1062 (9th Cir. 2002), a case cited
by plaintiff in support of its "cumulative impacts" argument, in
the categorical exclusion context.  See Salazar, 706 F.3d at
1097.

1    Plaintiff also argues that USFS improperly split the
2  Spring Logs and M9 Projects into two separate projects in order
3  to avoid the acreage limits of their respective CEs. (Pl.'s Mot.
4  at 26-27; Pl.'s Reply at 18-19.)   In Alaska Center for the
5  Environment, the Ninth Circuit addressed a plaintiff's argument
6  that USFS was attempting to avoid NEPA review by "breaking
7  proposed actions down into one-year temporary actions so as to
8  fit within the categorical exclusion and not complete an EA."
9  Alaska Ctr., 189 F.3d at 858 n.5.   The court rejected this
10 argument, explaining that "[t]he question of whether an action is
11 temporary and fits within the categorical exclusion is a factual
12 determination that implicates substantial agency expertise . . .
13 ."   Id.   The court held that USFS's "categorization of one-year
14 helicopter permits as temporary is not unreasonable or does not
15 rise to the level of arbitrary and capricious."   Id.

16    Similarly here, whether the Log Springs and M9 projects
17 are sufficiently distinct to qualify as two separate projects
18 under different CEs is a "factual determination that implicates
19 USFS expertise."   Id.   While USFS created a single BA due to the
20 projects' geographic proximity, (AR at 807), the two projects
21 target different sections of forest, (id. at 817), and the
22 primary aims of the two projects are different, (compare id. at
23 590 (explaining that the M9 Project is "primarily designed to
24 recover the economic value of salvageable dead trees"), with id.
25 at 694 (explaining that the Log Springs Project is "primarily
26 designed to reduce stand densities through commercial
27 thinning")).   Plaintiffs' assertion that every specialist report
28 covered both projects," (Pl.'s Reply at 19), while not at all

23

1   dispositive on the issue if true, is in fact false, as USFS
2   issued separate silviculture reports for the projects, for
3   example.  (AR at 570, 694).  Plaintiff thus fails to convince the
4   court that USFS's decision to create two separate projects
5   instead of a single project is "so implausible that it could not
6   be ascribed to a difference in view or the product of agency
7   expertise." Kimbell, 709 F.3d at 846.

8        Accordingly, summary judgment will be granted in favor
9   of USFS and against plaintiff on plaintiff's claim that USFS's
10  failure to consider cumulative impacts was arbitrary and
11  capricious.

12       E.   Failure to Prepare an EIS

13       "Under NEPA, an agency must prepare an EIS for any
14  proposed federal action 'significantly affecting the quality of
15  the human environment.'" Kimbell, 709 F.3d at 854 (quoting 42
16  U.S.C. § 4332(2)(c)).  Plaintiff essentially argues that an EIS,
17  rather than an EA, is required for the projects because the
18  projects will significantly affect the environment.  (Compl. ¶¶
19  146-52; Pl.'s Mem. in Support of Mot. for Summary J. at 36-37
20  (Docket No. 31).)

21       Since USFS's decision that the Log Springs and M9
22  Projects qualify for categorical exclusions was not arbitrary or
23  capricious, USFS's compilation of a project file and issuance of
24  a decision memo satisfy its obligations under NEPA.  See 36
25  C.F.R. § 220.6(e); Salazar, 706 F.3d at 1096 ("Application of a
26  categorical exclusion is not an exemption from NEPA; rather, it
27  is a form of NEPA compliance, albeit one that requires less than
28  where an environmental impact statement or an environmental

1  impact is necessary.").  The court will accordingly deny
2  plaintiff's motion for summary judgment and will grant USFS's
3  motion for summary judgment regarding failure to prepare an EIS
4  for the Log Springs and M9 Projects.

5          As for the Tatham Project, plaintiff "asks this court
6  to conclude, without the benefit of even an EA," that the Tatham
7  Project will have significant impacts sufficient to require an
8  EIS.  See Citizens for Better Forestry v. U.S. Dept. of Agric.,
9  481 F. Supp. 2d 1059, 1088-89 (N.D. Cal. 2007).  Plaintiff
10  "put[s] the cart before the horse, and request[s] that the court
11  make a finding regarding the precise nature of and exact
12  foreseeability of significant effects in this case, when all that
13  is required to render the CE inappropriate is the possibility of
14  significant effects."  Id. at 1088.  Here, as in Citizens,
15  because a CE was invoked and thus no EA was prepared to consider
16  whether significant effects would exist, USFS "did not create a
17  record that enable this court to make the type of determination
18  that [plaintiff] now seeks."  Id.  "[T]he court should not make
19  the determination requested by [plaintiff] without such a
20  record."  Id.  Only after preparation of an EA will the matter be
21  ready for judicial review, id. at 1090, and if USFS chooses to
22  prepare an EIS, this claim would be moot.  Accordingly, the court
23  will defer consideration of whether the Tatham Project requires
24  an EIS.

25          IT IS THEREFORE ORDERED that:

26          (1) plaintiff's motion to defer consideration of its
27  ESA claims under Federal Rule of Civil Procedure 56(d) be, and
28  the same hereby is, GRANTED;

1    (2) with respect to the Log Springs and M9 Projects,

2  plaintiffs' motion for summary judgment is DENIED and USFS's

3  motion for summary judgment is GRANTED; and

4    (3) with respect to the Tatham Project, plaintiffs'

5  motion for summary judgment is GRANTED and USFS's motion for

6  summary judgment is DENIED.  USFS shall not begin its proposed

7  actions on the Tatham Project without the preparation and

8  consideration of legally adequate documentation under NEPA.

9    Within fourteen days of this Order, the parties shall

10  submit a joint Status Report conforming to the April 26, 2013

11  Stipulation Scheduling Order, or explaining why the court should

12  modify that Scheduling Order.

13  DATED:  June 5, 2013

14

15  _____

16  WILLIAM B. SHUBB

    UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28