UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CONSERVATION CONGRESS                NO. CIV. 2:12-02416 WBS KJN

      Plaintiff,

                    MEMORANDUM AND ORDER RE:

   v.                               MOTIONS FOR SUMMARY JUDGMENT

UNITED STATES FORREST SERVICE
and UNITED STATES FISH AND
WILDLIFE SERVICE,

      Defendants.
_____/

----oo0oo----

        Plaintiff Conservation Congress brought this action against defendants United States Forest Service ("USFS") and United States Fish and Wildlife Service ("FWS") challenging defendants' actions in connection with three proposed vegetation clearance projects on the Mendocino National Forest.  Presently before the court are the parties' cross-motions for summary judgment under Federal Rule of Civil Procedure 56 and plaintiff's motion to defer consideration of its Endangered Species Act ("ESA") claims under Federal Rule of Civil Procedure 56(d).

1

I.    Relevant Facts and Procedural History

        In 2012, USFS authorized three projects to take place on the Grindstone Ranger District of the Mendocino National Forest, a unit of national forest managed by USFS. (Administrative Record ("AR") at 45, 528, 655 (Docket Nos. 20, 35).)  The Mendocino National Forest is home to the Northern Spotted Owl ("NSO"), a species listed as threatened under the ESA.  (Id. at 337.)  The Mendocino National Forest also contains the Buttermilk Late Successional Reserve ("Buttermilk LSR"). (Id. at 355, 1477.)[1]  The Buttermilk LSR "is the largest LSR on the forest and a crucial link" between various other LSRs in the region.  (Id. at 355.)

        When initially planning the projects, "all of the Buttermilk LSR [was] designated spotted owl critical habitat" under the 2008 rule for NSO critical habitat, see Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the N. Spotted Owl, 73 Fed. Reg. 47,326 (Aug. 13, 2008).  (AR at 355)  In December 2012, a new rule designating NSO critical habitat was published to become effective January 3, 2013.  See Endangered and Threatened Wildlife and Plants; Designation of Revised Critical Habitat for the N. Spotted Owl,

_____

        [1]    LSRs are managed to protect and enhance late successional forest habitat for species dependent upon its attributes, and to help ensure the conservation of species diversity. (AR at 1675.)  The main role of LSRs is to protect from large scale disturbances such as stand replacing fire, windthrow, insect and disease epidemics, and major human caused impacts.  (Id.)  As recognized by the Ninth Circuit, "LSRs lie at the heart of the [National Forest Plan's] ecosystem-based conservation strategy for the northern spotted owl and other endangered species."  Or. Nat. Res. Council v. Brong, 492 F.3d 1120, 1126 (9th Cir. 2007).

1   77 Fed. Reg. 71,876 (Dec. 4, 2012).  The 2012 rule affected the

2   NSO critical habitat designation of several areas of the

3   Mendocino National Forest.  (AR at 2542.)[2]

4        A.  Tatham Ridge Fuels Project

5            The first project, called the Tatham Ridge Fuels

6   Project ("Tatham Project"), was authorized by a decision memo

7   issued on May 25, 2012.  (Id. at 45-53.)  The Tatham Project was

8   designed to reduce wildfire hazard, to accelerate tree growth for

9   sustained timber productivity, and to develop late-successional

10  habitat in accordance with the Buttermilk LSR.  (See id. at 106,

11  367, 415-16, 2141.)

12           The Tatham Project involves three types of treatments:

13  (1) 1,300 acres of plantation thinning by removing small trees to

14  allow larger trees to grow more quickly; (2) approximately 879

15  acres of fuel break construction; and (3) 1,800 acres of

16  prescribed burning of the understory to reduce fuel loading of

17  forests.  (Id. at 46, 343-45.)  USFS created a biological

18  assessment ("BA") for the Tatham Project.  (Id. at 334).  At the

19  time of the BA, twenty-six percent of the total action area[3]

20  proposed by the Tatham Project would occur within the Buttermilk

21  LSR.  (Id. at 355.)  Approximately fifty-four percent of the

22  action area provides suitable NSO nesting/roosting, foraging, or

23  _____

24       [2]   USFS maintains that "[b]ecause of this new designation,
25  [t]he Buttermilk LSR is no longer coterminous with a critical
    habitat unit."  (Defs.' Cross-Mot. at 8 n.16 (Docket No. 39-1).)

26       [3]   USFS documents distinguish between the "project area"
    and the "action area."  "[P]roject areas only encompass the
27  actual units proposed for treatment," while "action areas"
    "include the proposed treatment units plus a 1.3 mile radius
28  surrounding the unit boundaries."  (AR at 809 (emphasis added).)

3

dispersal habitat.  (Id.)  USFS concluded that the Tatham
Project, "'May Affect, but is Not Likely to Adversely Affect' the
northern spotted owl."  (Id. at 383.)

      The Tatham Project was determined to qualify for
Categorical Exclusion Six ("CE 6"), 36 C.F.R. § 220.6(e)(6),
involving timber stand and/or wildlife habitat improvement
activities which do not include the use of herbicides.  (AR at
48-51.)  Thus, while USFS created a BA and decision memo, it did
not create an environmental assessment ("EA") or environmental
impact statement ("EIS") in connection with the project.

    B.   Log Springs Project

      USFS authorized the Log Springs Project by issuing a
decision memo on June 28, 2012.  (Id. at 658.)  The Log Springs
Project proposes the thinning of fifty to seventy year old
ponderosa pine over seventy acres to increase resiliency to
western bark beatles and to reduce high fuel loads, as well as to
meet the timber production quotas for the Mendocino National
Forest.  (Id. at 655-57, 695-97.)  In a joint BA prepared for
both the Log Springs and M9 Sanitation Salvage Project ("M9
Project"), USFS determined that the Log Springs Project does not
contain any designated NSO habitat or activity centers.  (Id. at
823-33.)  None of the project area occurs within the Buttermilk
LSR, but twenty-one percent of the action area overlaps with the
LSR.  (Id. at 821-22.)  USFS determined that both the Log Springs
and M9 Projects "'Would Not Affect' the northern spotted owl or
its Critical Habitat."  (Id. at 831.)

      USFS determined that the Log Springs Project qualified
for Categorical Exclusion Twelve ("CE 12"), 36 C.F.R. §

4

1  220.6(e)(12), involving the timber harvest of seventy acres or

2  less.  (Id. at 658.)  USFS did not create an EA or EIS for the

3  project.

4       C.   M9 Sanitation Salvage Project

5            The M9 Project was authorized by USFS through a

6  decision memo issued on June 28, 2012.  (Id. at 531.)  The M9

7  Project proposes salvage and sanitation harvest of dead, dying,

8  and at-risk trees on 250 acres, followed by reforestation "to

9  timely restore productivity to desired levels."  (Id. at 528-31,

10 573-75.)  The project area exhibits larger than normal pockets of

11 mortality due to bark beetle infestation which contributes to

12 heavy fuel loads. (Id. at 528, 530, 571-72.)  The M9 Project is

13 designed to address past beetle attacks, reduce fuel load on the

14 forest, and contribute to the Mendocino National Forest's annual

15 timber harvest levels.  (Id. at 529-30.)  As with the Log Springs

16 Project, none of the project area occurs within the Buttermilk

17 LSR, but twenty-one percent of the action area overlaps with the

18 LSR.  (Id. at 821-22).  No designated NSO habitat or activity

19 centers are present within the M9 Project area.  (Id. at 823-33.)

20 The joint BA found that the M9 and Log Springs Projects "'Would

21 Not Affect' the northern spotted owl or its Critical Habitat."

22 (Id. at 831.)

23           USFS determined that the M9 Project fit within

24 Categorical Exception Thirteen for the salvage harvest of 250

25 acres or less of dead or dying trees ("CE 13"), 36 C.F.R. §

26 220.6(e)(13), Categorical Exception Fourteen for sanitation

27 harvest to control insects or disease ("CE 14"), id. §

28 220.6(e)(14), and Categorical Exclusion Five for the regeneration

1    of native species ("CE 5"), id. § 220.6(e)(5).  (AR at 527, 531.)

2    USFS did not create an EA or EIS in connection with the project.

3          D.    Procedural History

4                Plaintiff is a non-profit organization dedicated to

5    maintaining, protecting, and restoring the native ecosystems of

6    northern California.  (Compl. ¶ 18 (Docket No. 1).)  Plaintiff

7    filed suit challenging defendants' actions in connection with the

8    approval of the three projects, bringing claims under both the

9    National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et

10   seq., and the ESA, 16 U.S.C. § 1531 et seq.  Plaintiff's NEPA

11   claims are brought exclusively against USFS and include: (1)

12   improper use of a categorical exclusion; (2) failure to analyze

13   cumulative impacts of the three projects; and (3) failure to

14   prepare an EIS.  (Id. ¶¶ 122-152.)  Plaintiff also brings various

15   ESA claims, the majority of which are brought against both USFS

16   and FWS.  (Id. ¶¶ 153-196.)

17               On December 21, 2012, defendants moved to limit the

18   court's review to the administrative record and deny discovery by

19   plaintiff.  (Docket No. 17.)  The court denied the motion without

20   prejudice to the right to object subsequently to the

21   consideration of material outside of the record.  (Feb. 26, 2013

22   Order at 2 (Docket No. 29).)  The court ordered that "[p]laintiff

23   may pursue discovery regarding its ESA claims against USFS while

24   plaintiff litigates its summary judgment motion on its claims

25   under [NEPA]."  (Id.)

26               Plaintiff moved for summary judgment on its NEPA claims

27   under Rule 56.  (Docket No. 30.)  Defendants, in their cross-

28   motion for summary judgment, moved for summary judgment on both

6

the NEPA and ESA claims.  (Docket No. 39.)  Plaintiff moved to

defer consideration of the ESA claims under Rule 56(d).  (Docket

No. 41.)

II.  <u>Motion to Defer</u>

Rule 56(d) provides that "[i]f a nonmovant shows by

affidavit or declaration that, for specified reasons, it cannot

present facts essential to justify its opposition, the court may

. . . defer considering the motion or deny it."  Fed. R. Civ. P.

56(d).  "To prevail under . . . Rule [56(d)], [a] part[y]

opposing a motion for summary judgment must make (a) a timely

application which (b) specifically identifies (c) relevant

information, (d) where there is some basis for believing that the

information sought actually exists."  <u>Emp'rs Teamsters Local Nos.</u>

<u>175 & 505 Pension Trust Fund v. Clorox Co.</u>, 353 F.3d 1125, 1129

(9th Cir. 2004) (internal quotation marks and citation omitted).

Here, plaintiff notes that the deposition of its ESA

expert has yet to occur, and documents regarding the defendants'

continued consultation regarding the Tatham Project were produced

during the briefing of the cross-motions for summary judgment.

(Docket No. 36.)  The court finds plaintiff's application

sufficient to defer consideration of its ESA claims under Rule

56(d), and plaintiff's motion will accordingly be granted.

The court now turns to the parties' cross motions for

summary judgment on plaintiff's NEPA claims.

III. <u>Cross-Motions for Summary Judgment</u>

The court reviews NEPA claims to determine whether they

are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law" under the Administrative Procedure

1  Act ("APA").  5 U.S.C. § 706(2)(A); see Ctr. for Biological

2  Diversity v. Salazar, 706 F.3d 1085, 1090 (9th Cir. 2013).

3  "Agency action is arbitrary and capricious if 'the agency has

4  relied on factors which Congress has not intended it to consider,

5  entirely failed to consider an important aspect of the problem,

6  offered an explanation for its decision that runs counter to the

7  evidence before the agency, or is so implausible that it could

8  not be ascribed to a difference in view or the product of agency

9  expertise.'"  Great Old Broads for Wilderness v. Kimbell, 709

10  F.3d 836, 846 (9th Cir. 2013) (quoting City of Sausalito v.

11  O'Neill, 386 F.3d 1186, 1206 (9th Cir. 2004)).

12       "A reviewing court 'generally must be at its most

13  deferential when reviewing scientific judgment and technical

14  analyses within the agency's expertise."  Id. (internal quotation

15  marks and citation omitted).  The court also "defers to [the

16  agency's] 'interpretation of its own regulations . . . unless

17  plainly erroneous or inconsistent with the regulations being

18  interpreted.'"  Salazar, 706 F.3d at 1090 (alteration in

19  original) (quoting Long Island Care at Home, Ltd. v. Coke, 551

20  U.S. 158, 171 (2007)).  "As the Supreme Court stated in Citizens

21  to Preserve Overton Park, Inc. v. Volpe, 'the ultimate standard

22  of review is a narrow one,' and '[t]he court is not empowered to

23  substitute its judgment for that of the agency.'"  Klamath-

24  Siskiyou Wildlands Cntr. v. Bur. of Land Mgmt., 387 F.3d 989, 993

25  (9th Cir. 2004) (quoting Citizens to Preserve Overton Park, Inc.

26  v. Volpe, 401 U.S. 402, 416 (1971)).

27     A.   Standing

28          "In limiting the judicial power to 'Cases' and

8

'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violations of law." Summers v. Earth Island Inst., 555 U.S. 488, 492 (2009). "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the alleged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." Id. (citing Friends of the Earth, Inc. v. Laildlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).

"'It is common ground that . . . [an] organization[] can assert the standing of its members.' But the organization asserting standing must provide 'specific allegations establishing that at least one identified member [has] suffered or would suffer harm . . . .'" W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 483 (9th Cir. 2010) (first five alterations in original) (quoting Summers, 555 U.S. at 494, 498). "While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the aesthetic interests of the plaintiff, that will suffice." Summers, 555 U.S. at 494 (citing Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972)).

In support of its motion, plaintiff submits the declaration of Denise Boggs, Executive Director and member of plaintiff's organization. (Docket Nos. 30-1, 30-2.) Ms. Boggs

declares that she regularly visits the Mendocino National Forest where the proposed projects will take place, (Boggs Decl. ¶¶ 2, 7 (Docket No. 30-1)), that she has plans to return in August 2013, (id. ¶ 7), and that she is interested in the wildlife and vegetation, particularly raptors and "beautiful large old trees and snags," (id.).   The proposed projects, and the Tatham Project in particular, allegedly threaten to injure these interests. (Id.)   The court finds that Ms. Boggs' declaration is sufficient to demonstrate plaintiff's standing.   See Kraayenbrink, 632 F.3d at 484-85 (declaration of Western Watersheds Project's founder identifying grazing allotment site that "he has personally visited and continues to visit, study, enjoy, and in which he pursues recreational activities," the regulation of which would allegedly damage his aesthetic enjoyment, was sufficient to satisfy standing).

B.   Waiver and Exhaustion of Administrative Remedies

"Persons challenging an agency's compliance with NEPA 'must structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1132 (9th Cir. 2011) (alterations in original) (quoting Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764 (2004)).   While an issue not raised during the notice and comment may result in waiver of that argument in federal court, see N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1156 n.2 (9th Cir. 2008), "a party has participated in a sufficiently meaningful way when it has alerted the agency to its position and claims," City of

1  Sausalito, 386 F.3d at 1208.

2          "The exhaustion doctrine serves 'to permit

3  administrative agencies to utilize their expertise, correct any

4  mistakes, and avoid unnecessary judicial intervention in the

5  process.'"  Kimbell, 709 F.3d at 846 (quoting Lands Council v.

6  McNair, 629 F.3d 1070, 1076 (9th Cir. 2010)).  "The APA requires

7  that plaintiffs exhaust available administrative remedies before

8  bringing grievances to federal court, 5 U.S.C. § 704," including

9  the specific appeal procedures established by the agency.

10  Kimbell, 709 F.3d at 846.  The Ninth Circuit has "defined the

11  exhaustion requirement broadly: 'The plaintiffs have exhausted

12  their administrative appeals if the appeal, taken as a whole,

13  provided sufficient notice to the [agency] to afford it the

14  opportunity to rectify the violations that plaintiffs alleged."

15  Great Basin Mine Watch v. Hankins, 456 F.3d 955, 965 (9th Cir.

16  2006) (alteration in original) (quoting Native Ecosystems Council

17  v. Dombeck, 304 F.3d 886, 899 (9th Cir. 2002)).  Plaintiffs are

18  not barred from bringing claims when the plaintiffs "'presented a

19  much less refined legal argument in their administrative

20  appeal.'"  Id. (quoting Native Ecosystems, 304 F.3d at 898).

21          USFS argues that plaintiff waived and failed to exhaust

22  its arguments regarding the Log Springs Project because

23  plaintiff's comments were submitted five days late, (Defs.'

24  Cross-Mot. at 20 (Docket No. 39)), while plaintiff argues that,

25  due to a publishing error regarding the related M9 Project, the

26  notice and comment date was delayed such that its joint comments

27  on the Log Springs and M9 Projects were timely, (Pl.'s Reply at

28  8-9 (Docket No. 42)).  It appears to the court that plaintiff, at

1   the very least, participated in a way that sufficiently alerted

2   USFS to its position and claims regarding the Log Springs

3   Project, see Barnes, 655 F.3d at 1132, especially when the two

4   projects shared many of the same expert reports, were originally

5   published on the same day, and were close geographically.  Since

6   USFS does not dispute that it was put on notice of plaintiff's

7   claims and arguments regarding the project, the court will

8   consider those arguments.

9           USFS also asserts that plaintiff's comments and

10  administrative appeal did not raise the argument that the size of

11  the Tatham Project precludes the use of a categorical exclusion,

12  and therefore this argument is waived and barred.  In its

13  comments and administrative appeal, plaintiff argued generally

14  that use of a categorical exclusion was inappropriate for the

15  Tatham Project.  (AR at 467-68, 18-20.)  Since "[t]he court of

16  appeals . . . has declined to require more than general

17  objections during the administrative process to avoid 'unduly

18  burden[ing] those who pursue administrative appeals unrepresented

19  by counsel who may frame their claims in non-legal terms rather

20  than precise legal forumlations,'" the court will consider

21  plaintiff's arguments regarding the size of the Tatham Project.

22  Save Strawberry Canyon v. U.S. Dep't of Energy, 830 F. Supp. 2d

23  737, 746 (N.D. Cal. 2011) (holding that raising only general

24  concerns about noise, and not specifically criticizing the manner

25  in which noise was calculated, was sufficient for the district

26  court to consider the argument).

27        C.   Improper Use of Categorical Exclusions

28             "NEPA requires that federal agencies perform

12

environmental analysis before taking any 'major Federal actions
significantly affecting the quality of the human environment.'"
Salazar, 706 F.3d at 1094 (quoting 42 U.S.C. § 4332(2)(c)).
"NEPA does not require particular environmental standards or
mandate that agencies achieve substantive environmental results."
Greater Yellowstone Coal. v. Lewis, 628 F.3d 1143, 1150 (9th Cir.
2010).  Congress in enacting NEPA "required only that the agency
take a 'hard look' at the environmental consequences before
taking a major action."  Baltimore Gas & Elec. Co. v. Natural
Res. Def. Council, Inc., 462 U.S. 87, 97 (1983).

        "Under the CEQ regulations, which were promulgated
pursuant to NEPA, each agency is directed to identify
'categorical exclusions' which are categories of actions which do
not, individually or cumulatively, have a significant effect on
the human environment and therefore, do not require an EA or
EIS."  Alaska Ctr. For Env't v. U.S. Forest Serv., 189 F.3d 851,
857 (9th Cir. 1999) (citing 40 C.F.R. § 1508.4).  Federal
agencies are also required to "provide for extraordinary
circumstances," which are circumstances "in which a normally
excluded action may have a significant environmental impact."  40
C.F.R. § 1508.4.  "When extraordinary circumstances are present,
the agency must prepare environmental documentation despite the
fact that the activity in question falls within a categorical
exclusion."  California v. Norton, 311 F.3d 1162, 1170 (9th Cir.
2002).

        To comply with NEPA when evaluating a particular
project for categorical exclusion, an agency must first determine
whether the proposed action falls within a categorical exclusion

13

and then determine whether "extraordinary circumstances" exist that would prevent application of the exclusion.  See id.; Salazar, 706 F.3d at 1097.  "Application of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental impact is necessary."  Salazar, 706 F.3d at 1096 (citing 40 C.F.R. § 15084.4).  "[W]here a proposed action fits within a categorical exclusion, full NEPA analysis is not required."  Id. at 1097 (citing Wong v. Bush, 542 F.3d 732, 737 (9th Cir. 2008)).

Consistent with CEQ regulations, USFS has promulgated seventeen categorical exceptions which require a project or case file and decision memo to satisfy NEPA.  See 36 C.F.R. § 220.6(e).  In providing for "extraordinary circumstances" sufficient to preclude use of its categorical exclusions, USFS has determined that:

> Resource considerations that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:
>
> (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
>
> (ii) Flood plains, wetlands, or municipal watersheds;
>
> (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
>
> (iv) Inventoried roadless area or potential wilderness area;
>
> (v) Research natural areas;
>
> (vi) American Indians and Alaska Native religious or cultural sites; and

14

1    (vii) Archaeological sites, or historic properties or
2    areas.

3  36 C.F.R. § 220.6(b)(1).

4        "The mere presence of one or more of these resource
5  conditions does not preclude use of a categorical exclusion . . .
6  ."  Id. § 220.6(b)(2).  "It is the existence of a cause-effect
7  relationship between a proposed action and the potential effect
8  on these resource conditions, and if such a relationship exists,
9  the degree of the potential effect of a proposed action on these
10 resource conditions that determines whether extraordinary
11 circumstances exist."  Id.

12        1.  Tatham Project

13       The USFS determined that the Tatham Project fit within
14 CE 6.  (AR at 48-51.)  CE 6 is an exclusion for "[t]imber stand
15 and/or wildlife improvement activities that do not include the
16 use of herbicides or do not require more than 1 mile of low
17 standard road construction."  36 C.F.R. § 220.6(e)(6).  Examples
18 include, but are not limited to:

19    (i) Girdling trees to create snags;

20    (ii) Thinning or brush control to improve growth or to
21    reduce fire hazard including the opening of an existing
       road to a dense timber stand;

22    (iii) Prescribed burning to control understory hardwoods
23    in stands of southern pine; and

24    (iv) Prescribed burning to reduce natural fuel build-up
       and improve plant vigor.

25 Id.  If a proposed project fits within this exclusion and no
26 extraordinary circumstances exist, USFS need only create a
27 project or case file and decision memo.  Id. § 220.6(e).
28 Plaintiff does not contest that the Tatham Project's plantation

15

1 thinking, fuel break construction, and prescribed burning are

2 activities that fit within CE 6.

3       Keeping in mind that an extraordinary circumstance is a

4 circumstance "in which a normally excluded action may have a

5 significant environmental impact," 40 C.F.R. § 1508.4 (emphasis

6 added), USFS's determination that no extraordinary circumstances

7 existed to preclude the use of a categorical exclusion does not

8 appear to be supported by the record.  A significant portion of

9 the Tatham Project occurs in NSO nesting/roosting or foraging

10 habitat, (AR at 363), short-term effects of thinning include "a

11 possible loss of suitable spotted owl habitat," (id. at 367), and

12 "[a]ll treatments have the potential to directly affect nesting,

13 foraging or dispersing individuals due to disturbance, noise or

14 smoke, which could possibly disrupt reproductive behavior and/or

15 cause nest failure," (id. at 371).  The BA prepared in support of

16 the Tatham Project admits that the Project "May Affect, but is

17 Not Likely to Adversely Affect the northern spotted owl."  (Id.

18 at 383 (internal quotation marks omitted).)

19       Similarly to California v. Norton, 311 F.3d 1162, (9th

20 Cir. 2002), "there is substantial evidence in the record that

21 exceptions to the categorical exclusion may apply, and the fact

22 that the exceptions may apply is all that is required to prohibit

23 use of the categorical exclusion."  Norton, 311 F.3d at 1177.[4]

24 —————————————

25     [4]    Norton also states that "[w]here there is substantial
evidence in the record that exceptions to the categorical
26 exclusion may apply, the agency must at the very least explain
why the action does not fall within one of the exceptions."
27 Norton, 311 F.3d at 1177.  Phrased another way, an agency's
explanation as to why a categorical exclusion applies is a
28 necessary, but not sufficient, condition to correctly apply a
categorical exclusion.  While USFS included discussion in the

The court also notes that, while the USFS Handbook "does not have the independent force and effect of law," see Southwest Center for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996), the Handbook provides that "[i]f the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exception." U.S. Forest Serv. Handbook 1909.15, ch. 30, § 31.2 (2010); see Alaska Ctr., 189 F.3d 858 (citing the USFS Handbook in its analysis of categorical exclusions).

One of the primary cases relied upon by USFS, Southwest Center for Biological Diversity v. United States Forest Service, 100 F.3d 1443 (9th Cir. 1996), noted that "an agency may issue a categorical exclusion even where threatened or endangered species are present if the agency determines that the project will not impact negatively on the species." Sw. Ctr., 100 F.3d at 1449 (emphasis added) (citing Pyramid Lake Paiute Tribe v. U.S. Dep't of the Navy, 898 F.2d 1410, 1414-16, 1420 (9th Cir. 1990)). Here, the agency did not determine that the project will not affect the NSO; rather, it concluded that the project is not likely to adversely affect the NSO. In Southwest Center, the defendant agency in that case made a "no effect" finding regarding the species at issue--similarly to the M9 and Log Springs Projects here--whereas the Tatham Project involved a finding that the Project may affect, but is not likely to adversely affect, the NSO. See id. at 1449-50.

Decision Memo explaining its decision, the court finds that USFS's explanation was not sufficient to establish that extraordinary circumstances were not present.

1       Since the court finds that USFS's decision to apply a

2  categorical exclusion to the Tatham Project is arbitrary and

3  capricious, plaintiff's motion for summary judgment on the Tatham

4  Project be granted and USFS's motion for summary judgment will be

5  denied.  USFS must therefore prepare legally adequate NEPA

6  documentation for the Tatham Project.

7              2.  <u>Log Springs Project</u>

8       As for the Log Springs Project, USFS determined that it

9  fit within CE 12, which provides for the exclusion of

10         [h]arvest of live trees not to exceed 70 acres, requiring
           no more than 1/2 mile of temporary road construction. .
11         . . Examples include, but are not limited to: (i) removal
           of individual trees for sawlogs, speciality products, or
12         fuelwood, and (ii) Commercial thinning of overstocked
           stands to achieve the desired stocking level to increase
13         health and vigor.

14  36 C.F.R. § 220.6(e)(12).

15      The Log Springs Decision Memo notes that project area

16  is "currently over stocked for ponderosa pine stands; this has

17  been shown to make the stands vulnerable to western bark beetle

18  attacks."  (AR at 655.)  In addition, the Memo notes that the

19  over stocking has created high fuel loads "which are above levels

20  which would allow for beneficial effects from fire."  (<u>Id.</u> at

21  656.)  These determinations are supported by the Log Springs

22  Project Silviculture Report.  (<u>Id.</u> at 694-95.)

23      The BA created in connection with the Log Springs and

24  M9 Projects notes that some NSO activity centers overlap the

25  action area of the projects, but after analyzing both the direct

26  and indirect effects on the NSO, USFS determined that the

27  projects "Would Not Affect" the NSO.  The BA found that no NSO

28  nesting, roosting, or foraging habitat will be treated, the

18

projects are outside the NSO critical habitat, any proposed
treatments are not within a quarter mile of any suitable NSO
nesting habitat so disturbance would not occur, and "[although]
some prey species may be temporarily displaced, the distance to
spotted owl foraging habitat is such that spotted owl foraging
success would not be affected." (Id. at 831.)  After the 2012
critical habitat rule was passed, USFS again determined that the
Log Springs Project would not adversely affect the NSO because
its project areas were not within newly designated critical
habitat.  (Id. at 2574.)

        From the record before the court, USFS's decisions that
the Log Springs Project qualifies for categorical exclusion under
CE 12 and that no extraordinary circumstances exist were not
arbitrary or capricious.  The court will accordingly deny
plaintiff's motion for summary judgment in its favor while
granting USFS's motion for summary judgment against plaintiff on
this claim.

            3.   M9 Project

        USFS determined that the M9 project fit within CE 13,
CE 14, and CE 5.  (AR at 531-33.)  To be excluded under CE 13,
the project must involve "[s]alvage of dead and/or dying trees
not to exceed 250 acres, requiring no more than 1/2 mile of
temporary road construction. . . . Examples include, but are not
limited to "(i) [h]arvest of a portion of a stand damaged by a
wind or ice event and construction of a short temporary road to
access the damaged trees, and (ii) [h]arvest of fire-damaged
tree." 36 C.F.R. § 220.6(e)(13).

        CE 14 involves "[c]ommercial and non-commercial

1  sanitation harvest to control insects or disease not to exceed
2  250 acres, requiring no more than 1/2 mile of temporary road
3  construction, including removal of infested/infected trees and
4  adjacent live uninfested/uninfected trees as determined necessary
5  to control the spread of insects or disease."  36 C.F.R. §
6  220.6(e)(14).  "Examples include, but are not limited to: (i)
7  Felling and harvest of trees infested with southern pine beetles
8  and immediately adjacent uninfested trees to control expanding
9  spot infestations, and (ii) Removal and/or destruction of trees
10 affected by a new exotic insect or disease . . . ."  Id.

11        CE 5 allows for the exclusion of "[r]egeneration of an
12 area to native tree species, including site preparation that does
13 not involve the use of herbicides or vegetation type conversion."
14 36 C.F.R. § 220.6(e)(5).  "Examples include, but are not limited
15 to: . . . (ii) Planting trees or mechanical seed dispersal of
16 native tree species following a fire, flood, or landside."  Id.

17        USFS's determination that the M9 Project fit within
18 these three CEs is not arbitrary or capricious.  The M9 Project
19 includes commercial thinning of 250 acres of ponderosa pine to
20 limit mortality caused by western bark beetle attacks, (AR at
21 528-29, 571-72), an activity which plausibly fits within CE 14,
22 see 36 C.F.R. § 220.6(e)(14).  USFS's determination that the M9
23 Project also fit within CE 13, which involves the salvage of dead
24 and dying trees is also not implausible, as just under a quarter
25 of all board feet of timber products harvested in the Project
26 would involve dead timber products, (AR at 529), and one of the
27 primary purposes of the project was to "recover the economic
28 value of salvageable dead trees," (id. at 570).  Finally, the M9

1  Project proposes reforestation for under stocked areas to restore

2  productivity to timber producing areas, (id. at 529), which

3  plausibly conforms with CE 5, see 36 C.F.R. § 200.6(e)(5).

4          As noted above, USFS adequately considered the impacts

5  on the NSO and was not arbitrary and capricious in finding that

6  no extraordinary circumstances existed to preclude application of

7  a categorical exclusion.  (See AR 831.)  Accordingly, the court

8  will deny plaintiff's motion for summary judgment and will grant

9  summary judgment in favor of USFS on this claim.

10         D.   Cumulative Impacts

11         In addition to challenging the projects independently,

12  plaintiff alleges that USFS failed to consider "cumulative"

13  impacts" of the combined Log Springs and M9 Projects, as well as

14  the projects' effects in combination with other regional

15  projects, such as nearby Smokey Project.  (Compl. ¶¶ 141-45;

16  Pl.'s Mot. at 32-35; Pl.'s Reply at 17-19.)  In Center for

17  Biological Diversity v. Salazar, the Ninth Circuit analyzed this

18  very issue in connection with the Bureau of Land Management's

19  application of a categorical exclusion to the issuance of a

20  gravel extraction permit.  Salazar, 706 F.3d at 1096.  The court

21  explained that the language of 40 C.F.R. § 1508.25, which

22  requires that an agency consider "indirect" and "cumulative"

23  impacts, "explicitly applies to environmental impacts

24  statements," and "application of [its] requirements to

25  categorical exclusions is inconsistent with the efficiencies that

26  the abbreviated categorical exclusion process provides."  Id. at

27  1097.  Noting that "where a proposed action fits within a

28  categorical exclusion, full NEPA analysis is not required," the

21

court concluded that § 1508.25's requirements "do not apply to [the agency's] categorical exclusion analysis in this case." Id.[5]

While the Salazar court engaged in a cumulative effects analysis, it did so because BLM's regulations required a finding of extraordinary circumstances when a proposed action would "'[h]ave a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.'" See id. at 1097 (alteration in original) (citing BLM NEPA Handbook App'x at 5, § 2.6; 43 C.F.R. § 46215(f)) ("Though not required to do so by section 1508.25, under BLM's own regulations, this 'extraordinary circumstances' analysis required BLM to consider whether issuance of the gravel permit would '[h]ave a direct relationship to other actions with individually insignificant but cumulative significant environmental effects.'" (emphasis added)).  Here, however, the Forest Service's regulations do not require a cumulative impacts analysis when determining whether there are extraordinary circumstances, and plaintiff points to no applicable regulation requiring any such analysis.  See 36 C.F.R. § 220.6(b); Forest Serv. NEPA Handbook § 31.2.  In the absence of a clear requirement that the USFS consider cumulative impacts in its categorical exclusion analysis, the court declines to require consideration of cumulative impacts.

---

[5]     Salazar specifically declined to apply Kern v. U.S. Bur. of Land Mgmt., 284 F.3d 1062 (9th Cir. 2002), a case cited by plaintiff in support of its "cumulative impacts" argument, in the categorical exclusion context.  See Salazar, 706 F.3d at 1097.

1    Plaintiff also argues that USFS improperly split the

2  Spring Logs and M9 Projects into two separate projects in order

3  to avoid the acreage limits of their respective CEs. (Pl.'s Mot.

4  at 26-27; Pl.'s Reply at 18-19.)   In Alaska Center for the

5  Environment, the Ninth Circuit addressed a plaintiff's argument

6  that USFS was attempting to avoid NEPA review by "breaking

7  proposed actions down into one-year temporary actions so as to

8  fit within the categorical exclusion and not complete an EA."

9  Alaska Ctr., 189 F.3d at 858 n.5.   The court rejected this

10  argument, explaining that "[t]he question of whether an action is

11  temporary and fits within the categorical exclusion is a factual

12  determination that implicates substantial agency expertise . . .

13  ."   Id.   The court held that USFS's "categorization of one-year

14  helicopter permits as temporary is not unreasonable or does not

15  rise to the level of arbitrary and capricious."   Id.

16    Similarly here, whether the Log Springs and M9 projects

17  are sufficiently distinct to qualify as two separate projects

18  under different CEs is a "factual determination that implicates

19  USFS expertise."   Id.   While USFS created a single BA due to the

20  projects' geographic proximity, (AR at 807), the two projects

21  target different sections of forest, (id. at 817), and the

22  primary aims of the two projects are different, (compare id. at

23  590 (explaining that the M9 Project is "primarily designed to

24  recover the economic value of salvageable dead trees"), with id.

25  at 694 (explaining that the Log Springs Project is "primarily

26  designed to reduce stand densities through commercial

27  thinning")).   Plaintiffs' assertion that every specialist report

28  covered both projects," (Pl.'s Reply at 19), while not at all

dispositive on the issue if true, is in fact false, as USFS

issued separate silviculture reports for the projects, for

example.  (AR at 570, 694).  Plaintiff thus fails to convince the

court that USFS's decision to create two separate projects

instead of a single project is "so implausible that it could not

be ascribed to a difference in view or the product of agency

expertise."  <u>Kimbell</u>, 709 F.3d at 846.

Accordingly, summary judgment will be granted in favor

of USFS and against plaintiff on plaintiff's claim that USFS's

failure to consider cumulative impacts was arbitrary and

capricious.

E.   <u>Failure to Prepare an EIS</u>

"Under NEPA, an agency must prepare an EIS for any

proposed federal action 'significantly affecting the quality of

the human environment.'"  <u>Kimbell</u>, 709 F.3d at 854 (quoting 42

U.S.C. § 4332(2)(c)).  Plaintiff essentially argues that an EIS,

rather than an EA, is required for the projects because the

projects will significantly affect the environment.  (Compl. ¶¶

146-52; Pl.'s Mem. in Support of Mot. for Summary J. at 36-37

(Docket No. 31).)

Since USFS's decision that the Log Springs and M9

Projects qualify for categorical exclusions was not arbitrary or

capricious, USFS's compilation of a project file and issuance of

a decision memo satisfy its obligations under NEPA.  <u>See</u> 36

C.F.R. § 220.6(e); <u>Salazar</u>, 706 F.3d at 1096 ("Application of a

categorical exclusion is not an exemption from NEPA; rather, it

is a form of NEPA compliance, albeit one that requires less than

where an environmental impact statement or an environmental

1   impact is necessary."). The court will accordingly deny

2   plaintiff's motion for summary judgment and will grant USFS's

3   motion for summary judgment regarding failure to prepare an EIS

4   for the Log Springs and M9 Projects.

5           As for the Tatham Project, plaintiff "asks this court

6   to conclude, without the benefit of even an EA," that the Tatham

7   Project will have significant impacts sufficient to require an

8   EIS. See Citizens for Better Forestry v. U.S. Dept. of Agric.,

9   481 F. Supp. 2d 1059, 1088-89 (N.D. Cal. 2007). Plaintiff

10  "put[s] the cart before the horse, and request[s] that the court

11  make a finding regarding the precise nature of and exact

12  foreseeability of significant effects in this case, when all that

13  is required to render the CE inappropriate is the possibility of

14  significant effects." Id. at 1088. Here, as in Citizens,

15  because a CE was invoked and thus no EA was prepared to consider

16  whether significant effects would exist, USFS "did not create a

17  record that enable this court to make the type of determination

18  that [plaintiff] now seeks." Id. "[T]he court should not make

19  the determination requested by [plaintiff] without such a

20  record." Id. Only after preparation of an EA will the matter be

21  ready for judicial review, id. at 1090, and if USFS chooses to

22  prepare an EIS, this claim would be moot. Accordingly, the court

23  will defer consideration of whether the Tatham Project requires

24  an EIS.

25          IT IS THEREFORE ORDERED that:

26          (1) plaintiff's motion to defer consideration of its

27  ESA claims under Federal Rule of Civil Procedure 56(d) be, and

28  the same hereby is, GRANTED;

25

1          (2) with respect to the Log Springs and M9 Projects,

2   plaintiffs' motion for summary judgment is DENIED and USFS's

3   motion for summary judgment is GRANTED; and

4          (3) with respect to the Tatham Project, plaintiffs'

5   motion for summary judgment is GRANTED and USFS's motion for

6   summary judgment is DENIED.  USFS shall not begin its proposed

7   actions on the Tatham Project without the preparation and

8   consideration of legally adequate documentation under NEPA.

9          Within fourteen days of this Order, the parties shall

10  submit a joint Status Report conforming to the April 26, 2013

11  Stipulation Scheduling Order, or explaining why the court should

12  modify that Scheduling Order.

13  DATED:  June 5, 2013

14

15  _____

16  WILLIAM B. SHUBB

    UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28